UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| LOUIS BOURGOIN, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | 2:13-cv-00055-JAW |
| | ) | |
| KATHLEEN SEBELIUS, Secretary, | ) | |
| United States Department of Health | ) | |
| and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR A TEMPORARY RESTRAINING ORDER**

On January 7, 2013, Kathleen Sebelius, the Secretary of the United States Department of Health and Human Services, approved the state of Maine's proposal to tighten the eligibility requirements for MaineCare, Maine's Medicaid program. The Plaintiffs are disabled adults facing reduction or termination of benefits under the tightened eligibility requirements. They maintain that the Secretary's approval violates the "maintenance of effort" provision of the Patient Protection and Affordable Care Act (ACA) as it applies to disabled adults and to adults whose income, after taking into account certain "disregards" applied under state law, does not exceed 133% of the federal poverty line, and ask this Court issue a temporary restraining order (TRO) before March 1, 2013, vacating Secretary Sebelius's approval of the more restrictive eligibility requirements.

The Court declines to issue the TRO. The contested provisions of the Medicaid Act are unusually complex, voluminous, and dense. Although the

Plaintiffs present a plausible interpretation of the ACA, so does the Secretary, and the Court cannot conclude with any confidence that one interpretation is more likely to succeed than the other.  As the Plaintiffs have the burden to establish a likelihood of success on the merits, the balance tips against them.  Furthermore, the record is too vague about the likelihood of irreparable harm to warrant a TRO.  Finally, the balance of the equities and the public interest are impossible to fairly assess on this record within the extraordinary time constraints the Plaintiffs have imposed.

## I.   STATEMENT OF FACTS

### A.   Procedural History

On February 20, 2013, Louis and Katherine Bourgoin, Donna Stevens, Heidi Brooks, and Katherine Sherrard filed a Complaint against Kathleen Sebelius, Secretary of the United States Department of Health and Human Services (DHHS), on behalf of themselves and all others similarly situated.  *Compl.* (ECF No. 1).  On February 21, 2013, the Plaintiffs filed a motion for class certification under Federal Rules of Civil Procedure 23(a) and 23(b)(2), stating that the class includes "over 6000 low-income recipients of health care benefits under MaineCare whose eligibility for Medicaid will be reduced or terminated on or after March 1, 2013."  *Pls.' Mot. for Class Certification* (ECF No. 13).  The same day, the Plaintiffs moved for a TRO and preliminary injunction.  *Pls.' Mot. for TRO and Prelim. Inj.* (ECF No. 14) (*Pls.' Mot.*).

A summons was issued to Secretary Sebelius on February 20, 2013, and Caroline Lewis Wolverton, Senior Counsel with the United States Department of Justice, appeared on her behalf the next day; Assistant United States Attorney John G. Osborn also appeared on behalf of the United States. *Summons* (ECF No. 9); *Notice of Appearance by John G. Osborn* (ECF No. 16); *Notice of Appearance by Caroline L. Wolverton* (ECF No. 18). The Court held a telephone conference on February 22, 2013. *Minute Entry* (ECF No. 20). During the conference, the Court set an expedited briefing schedule to allow for a ruling on the Plaintiffs' motion for a TRO by February 28, 2013. In accordance with the Court's expedited briefing schedule, Secretary Sebelius filed her opposition to the motion on February 26, 2013. *Def.'s Opp'n to Pls.' Mot. for TRO and Prelim. Inj.* (ECF No. 21) (*Def.'s Opp'n*). The Plaintiffs replied on February 27, 2013. *Pls.' Reply in Support of Mot. for TRO and Prelim. Inj.* (ECF No. 22) (*Pls.' Reply*).

### B.   The Plaintiffs' Allegations

The Plaintiffs' Complaint alleges the following:

#### 1.      Legal Framework

Title XIX of the Social Security Act establishes Medicaid, a jointly funded and administered federal and state program that provides medical assistance to certain low-income individuals. *Compl.* ¶ 18. Medicaid is implemented federally by DHHS; the Centers for Medicare & Medicaid Services (CMS) is the sub-department responsible for Medicaid. *Id.* ¶ 19.

State participation is optional, but states that choose to participate receive federal matching funds and must comply with the requirements of the federal Medicaid Act. *Id.* ¶ 20 (citing 42 U.S.C. § 1396, 42 C.F.R. §§ 430-484). Maine participates in Medicaid, calling its program MaineCare; MaineCare is administered by the Maine Department of Health and Human Services (MDHHS). *Id.* ¶ 21.

States that participate in Medicaid must extend eligibility to certain population groups and must provide beneficiaries with certain benefits. *Id.* ¶¶ 23-24. In particular, participating states must help certain beneficiaries pay for premiums, deductibles, co-payments, and co-insurance amounts under Medicare, a federal health insurance program for the elderly and disabled. *Id.* ¶ 25. Medicare is divided into four primary parts, three of which are relevant here: Part A covers hospitals; Part B, physicians and other services; and Part D, prescription drugs. *Id.* ¶¶ 2, 49. The Medicaid Act requires participating states to provide this type of help to three groups of beneficiaries: "Qualified Medicare Beneficiaries" (QMBs), "Specified Low Income Medicare Beneficiaries" (SLMBs), and "Qualified Individuals" (QIs). *Id.* ¶¶ 26-28.

Eligibility for one of these groups depends on, among other things, an applicant's income.[1]  To qualify as a QMB, an applicant must have "countable income" at or below 100% of the federal poverty level (FPL). *Id.* ¶ 26. To qualify as a SLMB, an applicant must have countable income from 101% to 120% of the FPL.

---

[1]     Eligibility requires also that the applicant be entitled to Medicare Part A benefits and that the applicant have resources that do not exceed twice the Supplemental Security Income (SSI) resource eligibility standard. *Compl.* ¶¶ 26-28.  Only the income requirement is relevant here.

*Id.* ¶ 27.  To qualify as a QI, an applicant must have countable income from 121% to 135% of the FPL.  *Id.* ¶ 28.  States may limit the number of QIs based on federal funding.  *Id.*

For QMBs, participating states must pay Medicare Part A and Part B premiums as well as non-covered medical deductibles, co-payments, and co-insurance costs.  *Id.* ¶ 26.  For SLMBs and QIs, participating states must pay Medicare Part B premiums.  *Id.* ¶¶ 27-28.

"Countable income" rather than gross income is the figure used to determine Medicaid eligibility.  *See id.* ¶ 29.  Countable income is calculated by subtracting certain "disregards" from gross income.  *Id.*  Federal law sets a floor on the amount of disregards that a participating state must apply, but states may disregard greater amounts or different sources of income; the effect of a greater disregard is to expand Medicaid eligibility in the state.  *Id.* ¶¶ 29-31.

On March 23, 2010, the ACA was signed into law.  The ACA contains a "maintenance of effort" requirement, which generally prohibits participating states from making their eligibility standards, methodologies, or procedures more restrictive between March 23, 2010, and the date that the Secretary of DHHS determines the state's health insurance exchange is fully operational.  *Id.* ¶ 32; 42 U.S.C. § 1396a(gg)(1).  The maintenance of effort requirement contains an exception with respect to non-pregnant, non-disabled adults whose income exceeds 133% of the FPL; to use the exception, a participating state must certify to the Secretary of

DHHS that it has or projects to have a budget deficit. *Id.* ¶ 37; 42 U.S.C. § 1396a(gg)(3).

### 2.     The Disputed State Plan Amendment

On March 23, 2010, Maine calculated countable income by applying an additional disregard amount equal to 50% of the FPL.[2]  Subsequently, however, the Maine Legislature passed a law authorizing MDHHS to restrict MaineCare eligibility contingent on receiving from CMS a written waiver of the maintenance of effort requirements or a written notification that such a waiver is not necessary. 2011 Me. Laws 657, §§ HH-2, HH-3.  On December 20, 2011, the Commissioner of MDHHS submitted a letter to Secretary Sebelius certifying a budget deficit in state fiscal year 2013.  *Compl.* ¶ 39.  On August 1, 2012, the Commissioner submitted a State Plan Amendment (SPA) to CMS seeking approval.  *Id.* ¶ 40.  On January 7, 2013, CMS approved an amendment that would reduce the additional disregard from 50% of the FPL to 40% of the FPL.[3]  *Id.* ¶ 41; *see Pls.' Mot. Attach. 3*, Transmittal and Notice of Approval of State Plan Material (Approval Date Jan. 7, 2013) (ECF No. 14-3).  The approved SPA is set to take effect March 1, 2013. *Compl.* ¶ 42.

### 3.     The Named Plaintiffs

---

[2]     The Plaintiffs' allegations, which track the Maine State Plan, say the same thing in a more complicated way.  *See Compl.* ¶¶ 34-36; *Pls.' Mot. Attach. 2*, State Plan Under Title XIX of the Social Security Act (effective 5/1/05) (ECF No. 14-2).  They present the calculation as: for QMBs, disregard income in the amount of the difference between 100% of the FPL and 150% of the FPL; for SLMBs, disregard income in the amount of the difference between 120% of the FPL and 170% of the FPL; and, for QIs, disregard income in the amount of the difference between 135% of the FPL and 185% of the FPL.  *Id.*  The amount of the disregard is equal to 50% of the FPL in each case.

[3]     Again, the allegations and the SPA recite a complicated-sounding formula that is equivalent to a disregard of 40% of the FPL for each of the three eligibility categories.

### a.     Louis and Katherine Bourgoin

Louis Bourgoin, age 67, lives with his wife Katherine, age 69, in Lewiston, Maine. *Compl.* ¶ 43. Mr. Bourgoin's income consists of $1334 per month in Social Security benefits. *Id.* Mrs. Bourgoin receives $829 per month in Social Security benefits and $289.22 from a pension. *Id.* The Bourgoins' total income is $2452 per month. *Id.* The Complaint alleges that they use this income to pay their normal living expenses and have insufficient income and resources to meet their medical care expenses. *Id.*

Mr. Bourgoin is disabled, has been diagnosed with incurable and terminal Stage 4 liver cancer that has spread to his stomach, and is undergoing chemotherapy and other treatments and may need surgery. *Id.* ¶¶ 44-45. His illness and treatment takes up most of his time and prevents him from working. Mrs. Bourgoin is also disabled and is recovering from breast cancer; she takes medication for this purpose and for back problems. *Id.* ¶¶ 46-47. Mrs. Bourgoin last worked part-time in 2009 as a housekeeper in a nursing home, but stopped working due to her health, which continues to decline. *Id.* ¶ 48.

The Bourgoins are both enrolled in Medicare and MaineCare and qualify as QIs; accordingly, MaineCare has been paying their Medicare Part B premiums of $104.50 per month, per person, and because of their QI status, they qualify for extra help with Medicare Part D prescription drug costs. *Id.* ¶ 49. The Bourgoins have outstanding medical bills and a number of upcoming appointments; Medicare will not cover the entire cost of the bills, and the Bourgoins rely on MaineCare to pay

their Medicare premiums and prescription drug costs. *Id.* ¶ 50. In late January 2013, MDHHS sent the Bourgoins notices informing them that they are being terminated from MaineCare and are losing MaineCare coverage of their Medicare Part B premiums. *Id.* ¶ 51. The Bourgoins allege that if this termination takes effect, they will quickly become impoverished and unable to pay for their medically necessary health care. *Id.* ¶ 52.

### b.    Donna Stevens

Donna[4] Stevens is 64 years old and lives alone in Waterville, Maine. *Id.* ¶ 53. She receives a total income of $1464 per month in Social Security Disability and Railroad Retirement Widows benefits; she uses this money to pay her normal living expenses and "barely gets by." *Id.*

Ms. Stevens has been disabled since 2000 due to severe osteoarthritis. *Id.* ¶ 55. She is enrolled in both Medicare and MaineCare and qualifies as a QMB; accordingly, MaineCare pays her Medicare Part A deductible of $1184, and for the hospital expenses and co-payments that Medicare Part A does not cover. *Id.* ¶ 56. In late January 2013, MDHHS sent Ms. Stevens a notice informing her that she is losing MaineCare coverage of her Medicare Part A and Part B deductibles and co-insurance. *Id.* ¶ 57. Ms. Stevens alleges that this loss will quickly impoverish her and that she will no longer be able to afford to pay her health care costs. *Id.* ¶ 58.

### c.    Heidi Brooks

---

[4]     The Complaint also refers to a Dorothy Stevens but this appears to be Donna Stevens. *See Compl.* ¶¶ 56-58; *Pls.' Mot. Attach. 8*, Aff. of Donna Stevens (ECF No. 14-8).

Heidi Brooks is 42 years old and lives in Lewiston, Maine. *Id.* ¶ 59. Her total income consists of $1770 per month in Social Security Disability benefits; she uses this money to pay normal living expenses. *Id.*

Ms. Brooks has been disabled since 2003, suffers from several medical conditions that prevent her from working, and has been hospitalized on a number of occasions. *Id.* ¶¶ 60-61. She takes medications that are sedating and interfere with her ability to concentrate and work. *Id.* ¶ 61. Ms. Brooks is enrolled in both Medicare and MaineCare and qualifies as a QI; accordingly, MaineCare pays her Medicare Part B premium of $104.50 per month. *Id.* ¶ 62. Due to her QI status, she also receives extra help for prescription drugs and does not have to pay the $30 Medicare Part D monthly premium, the $365 annual Part D deductible, or the Part D "donut hole," which can be hundreds of dollars per year. *Id.* Losing QI status would result in high co-payments for the "very expensive" brand name drug she takes and for which there is no generic substitute; without insurance, her monthly drug costs would be $1650 per month. *Id.* She can avoid some of these costs by enrolling in Medicare Part D. *Id.* In late January 2013, MDHHS notified Ms. Brooks that she is being terminated from the MaineCare program; Ms. Brooks does not know how she will be able to pay her medical bills. *Id.* ¶ 63.

### d. Katherine Sherrard

Katherine Sherrard is 62 years old and lives in Kennebunk, Maine. *Id.* ¶ 64. She receives $1491 per month in Social Security Disability benefits. *Id.*

9

Ms. Sherrard has been disabled since 2000, suffers from many medical conditions, takes medications, and visits the doctor on average eight times per month. *Id.* ¶¶ 65-67. She is enrolled in both Medicare and MaineCare and qualifies as a QMB; accordingly, MaineCare has been paying her Medicare Part A and Part B deductibles and co-insurance and her Part B premiums, and has been providing extra help with prescription drug costs not covered by Medicare Part D. *Id.* ¶ 68. In late January 2013, MDHHS notified Ms. Sherrard that she will be losing MaineCare coverage for her Medicare Part A and Part B cost sharing amounts; Ms. Sherrard alleges that following this loss, she will quickly be impoverished and will no longer be able to afford treatment. *Id.* ¶ 69.

### 4.     The Claim

The Plaintiffs seek judicial review pursuant to the Administrative Procedure Act (APA), which provides that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* ¶ 71; 5 U.S.C. § 706(2)(A), (C). They contend that "Defendant Sebelius' action authorizing Maine to reduce Medicaid eligibility . . . exceeded her limited authority, as set forth in 42 U.S.C. § 1396a(gg)(3), and, thus, violated [the] APA." *Compl.* ¶ 72.

## II.     THE PARTIES' POSITIONS

### A.     The Plaintiffs' Motion for TRO and Preliminary Injunction

The Plaintiffs seek a TRO and preliminary injunction pursuant to Federal Rule of Civil Procedure 65 to prevent approximately 6000 people from losing their

health coverage on March 1, 2013. *Pls.' Mot.* at 1. The Plaintiffs note that to secure either a TRO or a preliminary injunction, they bear the burden of establishing that they are "likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id.* at 3 (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). They claim that each of the four factors weighs in their favor. *Id.*

Regarding likelihood of success on the merits, the Plaintiffs contend that "the Secretary's action in approving Maine SPA #12-010(A) violates the unambiguous requirements of the Medicaid Act." *Id.* at 11. They say that the exception to the general maintenance of effort requirement allows restriction of eligibility "only with respect to nonpregnant, nondisabled adults." *Id.* at 11-12; 42 U.S.C. § 1396a(gg)(3). The Plaintiffs, all disabled adults, are thus "clearly protected by the statutory maintenance of effort requirement." *Id.* at 12. They claim that CMS agreed with their position before approving the amendment, citing a letter from DHHS's Boston Regional Office dated April 15, 2011. *Id.* at 13; *see Additional Attachments* (ECF No. 19).

Moreover, argue the Plaintiffs, DHHS's approval of the amendment violates the Medicaid Act for another reason. *Pls.' Mot.* at 14. The maintenance of effort exception permits the restriction of eligibility only as to individuals whose incomes exceed 133% of the FPL. *Id.* According to the Plaintiffs, the Secretary has taken the position that the term "income" in 42 U.S.C. § 1396a(gg)(3) refers not to gross

11

income but to countable income, as determined by the standards, methodologies, and procedures in effect on March 23, 2010. *Id.* (citing CMS SMDL # 11-001 at Q5, available at http://downloads.cms.gov/ cmsgov/ archived-downloads/ SMDL/ downloads/ smd11001.pdf). Accordingly, "[t]he vast majority of Medicare buy-in populations currently covered in Maine" does not have income that exceeds 133% of the FPL, and Maine cannot restrict their MaineCare eligibility under 42 U.S.C. § 1396a(gg)(3). *Id.* The Plaintiffs maintain that "[t]here is no statutory basis for treating allowed disregards for individuals in the Medicaid and Medicare programs differently from those allowed for other population groups." *Id.*

Regarding the second factor, likelihood of irreparable harm, the Plaintiffs cite caselaw to support their case. *Id.* at 15. They claim that their Affidavits "show that the Defendant's policies will cause them irreparable harm." *Id.* at 16. The Bourgoins claim that "[i]f MaineCare coverage is reduced, they will quickly become impoverished and unable to pay for their medically necessary health care." *Id.* at 17. Ms. Brooks says that she "does not know how she will be able to pay her medical bills." *Id.* Ms. Sherrard argues that if she loses her MaineCare coverage, she "will quickly be impoverished and face no longer being able to afford to pay for her treatment" for numerous medical conditions. *Id.* at 17-18. Ms. Stevens writes that she "is faced with entering the hospital this month for surgery, not knowing if her MaineCare will help pay for her hospital costs, her physician costs or the on-going care that she needs." *Id.* at 18.

12

Regarding the third factor, the balance of equities, the Plaintiffs argue that they face "continuing physical, emotional and financial harm in the absence of relief" whereas "complying with the requirements of federal law cannot harm the Defendant." *Id.* at 18-19.

Regarding the fourth factor, whether the injunction is in the public interest, the Plaintiffs argue that "[t]he public interest is served when laws passed by Congress are enforced." *Id.* at 19. They cite caselaw discussing Medicaid and claim that "[p]reserving Plaintiffs' health, well-being, and independence is squarely at issue in this case and is clearly in the public interest." *Id.* at 19.

Finally, the Plaintiffs urge the Court to waive the bond requirement of Federal Rule of Civil Procedure 65. *Id.* at 20.

## B.    The Defendant's Opposition

In opposition, the Secretary argues that the Plaintiffs cannot meet their burden to demonstrate likelihood of success on the merits of their claim. *Def.'s Opp'n* at 1, 7-13. She asserts that her decision to approve the SPA should be reviewed in accordance with the framework described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and claims that her interpretation of the Medicaid statute is entitled to deference so long as it is reasonable. *Def.'s Opp'n* at 7.

The Secretary's interpretation of the maintenance of effort exception found at 42 U.S.C. § 1396a(gg)(3) is based on her reading of other provisions of the Medicaid Act, and on the principle that a statute is to be read as a whole. *Id.* at 8-10. She

argues that the Medicaid statute generally does not authorize coverage of subgroups, and that state plans must cover, or not cover, groups as a whole. *Id.* at 8. Accordingly, she interprets the phrase "nonpregnant, nondisabled adults" in 42 U.S.C. § 1396a(gg)(3) to refer to the basis on which the group is eligible for Medicaid, rather than to the traits of individuals within groups that are eligible for Medicaid on some basis other than pregnancy or disability. *Id.* Thus, in her view, "[g]roups eligible for Medicaid based on a characteristic other than disability, pregnancy or status as a child fall within the MOE exception." *Id.* She notes that the Plaintiffs "have alleged that they are disabled but not that they are part of a group that is eligible for Medicaid on the basis of disability." *Id.*

The Secretary supports her interpretation by arguing that it is "comparable to CMS's interpretation of the MOE requirement that applies to children under the Children's Health Insurance Program" and that "CMS's longstanding interpretation of the Medicaid statute allows state plans to cover the entire population of Medicare buy-in groups but does not permit coverage of subgroups of that population." *Id.* at 9. She asserts that "the Medicaid statute does not authorize a state plan to distinguish between individuals within a group based on the reason they qualify for Medicare." *Id.* She claims that congressional intent supports her interpretation, and that CMS was concerned that the Plaintiffs' reading of the statute might present administrative difficulties for states, since states "may not have information indicating whether individuals in Medicare buy-in groups are qualified for Medicare based on disability." *Id.*

14

Based on her reading of the statute, the Secretary disputes the Plaintiffs' contention that individuals who meet the Social Security standards for disability may not be considered "nondisabled" under 42 U.S.C. § 1396a(gg)(3). *Def.'s Opp'n* at 10. She argues that as the Plaintiffs' eligibility for Medicaid was not based on their disability status, they are "nonpregnant, nondisabled adults" within the meaning of 42 U.S.C. § 1396a(gg)(3). *Def.'s Opp'n* at 10.

Regarding the income requirement of 42 U.S.C. § 1396a(gg)(3), the Secretary contends that "income" means "actual income" before the application of any disregards. *Def.'s Opp'n* at 11-13. The Secretary maintains that the Plaintiffs' assertion that a February 25, 2011 letter from CMS suggested otherwise misinterprets that letter. *Id.* at 12. She argues that the Plaintiffs' interpretation "would render the MOE exception 'almost meaningless.'" *Id.*

The Secretary adds that the irreparable harm and public interest factors do not justify issuing a temporary restraining order. *Id.* at 13-14.

### C. The Plaintiffs' Reply

In their Reply, the Plaintiffs again assert that they are likely to succeed on the merits, arguing that "the statute is clear on its face" and "prohibits termination of eligibility for pregnant adults, disabled adults or for those with incomes under 133% of the [FPL] and does not allow the Secretary's interpretation." *Pls.' Reply* at 1. The Plaintiffs contend that the Secretary's interpretation does not warrant deference under *Chevron* since it was not adopted through a formal, notice-and-comment rulemaking process. *Id.* at 1-2. The Plaintiffs reiterate that "[t]he plain language and overall structure of 42 U.S.C. § 1396a(gg) foreclose the Secretary's

15

interpretation." *Id.* at 2. The Plaintiffs deny that administrative convenience is a proper consideration in interpreting the statute. *Id.* at 4. They claim that the statute compels their interpretation that "income" means "countable income," and includes state disregards. *Id.* at 4-5. They maintain that the Secretary has issued guidance supporting their interpretation. *Id.* at 5-6. In their view, the construction the Secretary now defends "would drive a truck through a narrow exception." *Id.* at 6. The Plaintiffs again argue that the irreparable harm, balance of the equities, and public interest factors weigh in favor of granting the motion for a TRO. *Id.* at 6-7.

## III.   DISCUSSION

### A.   Procedural Posture

The procedural posture of this case falls between a motion for a TRO and a motion for a preliminary injunction. TROs allow courts to provide emergency relief on an ex parte basis and to "preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction." 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL RULES OF CIVIL PROCEDURE § 2951, at 253 (2d ed. 1995). Preliminary injunctions are "issued to protect plaintiff from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits." *Id.* § 2947, at 121 (2d ed. 1995). TROs may be granted with or without notice to the adverse party, though they must comply with Rule 65(b) if they are granted without notice. *Id.* at 253-54; FED. R. CIV. P. 65(b). Preliminary injunctions will, in the usual case, "be decided only after the parties have presented testimony in support of their respective positions,"

16

although Rule 65 does not explicitly require a hearing.  11A Wright, Miller & Kane § 2949, at 220.

Here, the Secretary has been given notice and an opportunity to respond, but the timing of the Plaintiffs' motion precluded an evidentiary hearing, forced the Secretary to file her opposition less than a week after receiving notice of the motion, and required the Court to issue this Order the day after receiving the Plaintiffs' reply brief.[5]

## B.     The Four-Factor Test for Preliminary Injunctive Relief

The standard for issuing a temporary restraining order is the same as for a preliminary injunction, and is provided by traditional equity doctrines.  *Aftermarket Auto Parts Alliance, Inc. v. Bumper2Bumper, Inc.*, Civil No. 1:12-cv-00258-NT, 2012 U.S. Dist. LEXIS 143685, *3 (D. Me. Oct. 4, 2012); 11A Wright, Miller & Kane § 2942, at 37.

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Federal Savings Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)).  "In order for a court to grant this type of relief, a plaintiff 'must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that the injunction is in the public interest." *Id.* (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555

---

[5]     In ruling on the motion as quickly as possible, the Court has done its level best, but the parties should appreciate "the temporal constraints under which the district court labored." *See Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2004).

U.S. 7, 20 (2008)). "The party seeking the preliminary injunction bears the burden of demonstrating that these four factors weigh in its favor." *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). "[T]rial courts have wide discretion in making judgments regarding the appropriateness of" preliminary injunctive relief. *Sanchez v. Esso Std. Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2010).

### 1. Likelihood of Success on the Merits

The First Circuit has observed that likelihood of success on the merits is both the "sine qua non" and the "most important part of the preliminary injunction assessment," explaining that "if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7, 10 (1st Cir. 2012) (quoting *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2008), and *New Comm Wireless Servs. Inc. v. Sprintcom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)). To carry their burden on this factor, the Plaintiffs "must establish a 'strong likelihood' that they will ultimately prevail." *Id.* at 10 (quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).

The Plaintiffs contend that "Defendant Sebelius' action authorizing Maine to reduce Medicaid eligibility . . . exceeded her limited authority, as set forth in 42 U.S.C. § 1396a(gg)(3), and, thus, violated [the] APA." *Compl.* ¶ 72. The Defendant responds that her approval of the SPA was lawful and asserts that her interpretation of the Medicaid statute is entitled to deference.

Resolving this dispute will require the Court first to determine the appropriate level of deference (if any) to give to the Secretary's action and then to

18

consider the Secretary's nuanced interpretation of a complicated statute.  The Plaintiffs make a plausible case that the plain language of 42 U.S.C. § 1396a(gg)(3) precludes the state of Maine from restricting their MaineCare eligibility on March 1, 2013.  The Secretary makes a plausible case that this language must be interpreted in the context of other provisions within the same statute.  The question is not a simple one, and it is difficult at this stage, especially given the extraordinary complexity of this area of law, to predict with any confidence which view is likely to prevail.

The Secretary had only a few days to draft her response, and reserves her right to provide a fuller response following this Order.  *Def.'s Opp'n* at 6 n.4.  The Plaintiffs had one day to consider the Secretary's response and prepare a reply.  The Court is issuing this Order the day after receiving the Plaintiffs' reply.  Given the complicated legal questions involved and the rushed consideration the parties and the Court have been forced to give those questions at this stage, the Court concludes that the Plaintiffs have not carried their burden to convince the Court of the "strong likelihood" of their success on the merits.  *Fortuño*, 699 F.3d at 10.

### 2.    Likelihood of Irreparable Harm

Plaintiffs seeking preliminary relief must demonstrate "that irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22 (emphasis in original).  "[I]rreparable harm can consist of 'a substantial injury that is not accurately measurable or adequately compensable by money damages.'"  *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) (*Ross-*

*Simons II*) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) (*Ross-Simons I*)).  "[D]istrict courts have broad discretion to evaluate the irreparability of alleged harm." *Ross-Simons II*, 217 F.3d at 13 (quoting *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989)).

The record contains little evidence of any specific irreparable harm that is likely to result if the Court denies the motion for a TRO.  To be sure, the Plaintiffs are disabled, have come to rely on MaineCare to pay their medical costs, and will be financially burdened by a reduction in their benefits.  But their assertions regarding the likelihood of irreparable harm are broad and conclusory, such as "[i]f MaineCare coverage is reduced, [the Bourgoins and Ms. Sherrard] will quickly become impoverished and unable to pay for their medically necessary health care," *Pls.' Mot.* at 17, and "Plaintiff Brooks does not know how she will be able to pay her medical bills." *Id.*  Ms. Stevens mentions that she has an operation scheduled this month, but does not indicate that the March 1, 2013 amendment is likely to prevent her operation from going forward.  *Pls.' Mot. Attach. 8*, Aff. of Donna Stevens (ECF No. 14-8); *Pls.' Mot.* at 18 ("she is faced with entering the hospital this month for surgery, not knowing if her MaineCare will help pay for her hospital costs, her physician costs or the on-going care that she needs").

Moreover, it is unclear on this record what Maine's more restrictive eligibility requirements will mean in practical terms to each of the Plaintiffs.  The Complaint sets forth a laddered system of eligibility and a corresponding set of available benefits.  According to the Complaint, for example, QMB status, which affords the

greatest benefits, was available to individuals whose income fell at or below 150% of the FPL, and SLMB status, which affords less generous benefits, was available to individuals whose income fell between 151% and 170% of the FPL.[6]  Maine plans to reduce the ranges to at or below 140% for QMB status and 141% to 160% for SLMB status.  It therefore appears that an individual whose income falls between 141% and 150% of the FPL—a QMB under the old standard—becomes a SLMB under the amendment, and faces a reduction but not a termination of MaineCare benefits.  If this is correct, then the only individuals who would lose all of their MaineCare coverage would be the QIs with the highest incomes, and this group, though certainly not well-off, is the least likely of all beneficiaries to have to forego necessary care.  While a reduction rather than a termination in benefits does not preclude the possibility of irreparable harm, it makes it less probable, and the vagueness of the Plaintiffs' evidence forces the Court to attempt to draw reasonable inferences.

Without more information regarding the balance sheets of the Plaintiffs and their health care providers' billing practices, the Court can reach no confident conclusions as to whether and if so when the Plaintiffs' health care providers would be likely to refuse treatment.  However, based on the specific facts presented to the Court, the Plaintiffs have not established that it is likely that any of them will have to forego medically necessary care in the immediate future as a result of the change

---

[6]     In fact the eligibility thresholds are somewhat higher, since they also incorporate federally required income disregards.  *Compl.* ¶ 29.  As it is not clear how the federally-required disregards compare to the FPL, the Court ignores them here for purposes of simplicity.

in the benefits on March 1, 2013.  The Bourgoins receive income of $2452 per month; the amendment will require them to pay an additional $104.50 per month per person for their Medicare Part B premiums and unspecified additional amounts under Medicare Part D.  Though it is certainly true that the amendment will not help their financial situation, there is no evidence of what their other expenses are (other than "normal living expenses"), and it is difficult to draw an inference of immediate harm from this sparse information.  Ms. Brooks's assertions are similar to the Bourgoins'.  She adds that "[w]ithout insurance, [her] monthly drug costs would be $1650 per month," *Pls.' Mot. Attach. 6*, Aff. of Heidi Brooks, ¶ 3 (ECF No. 14-6), but as it appears that Medicare will cover the bulk of those costs (she states that her co-payments under Medicare Part D will be "very high" but gives no figure), it is not clear how the $1650 figure is relevant.  Ms. Sherrard and Ms. Stevens were QMBs under the old methodology, and should, as the Court discussed, continue to qualify at least for SLMB status even after the amendment, so they stand to lose some but not all of their MaineCare benefits.  While any reduction in benefits will present financial challenges, there is no evidence in their affidavits that the reduction is likely to force them to forego medically necessary care in the immediate future.  *Pls.' Mot. Attach. 7*, Aff. of Katherine Sherrard (ECF No. 14-7); *id. Attach. 8*, Aff. of Katherine Sherrard (ECF No. 14-8).

It is important to stress that only the immediate future is relevant to the analysis.  Even if the Court were to accept the Plaintiffs' assertions that the amendment will, at some point, cause them to forego medical care, the record is

particularly unclear as to when that is likely to happen; the Bourgoins assert, for instance, that they "will quickly become impoverished" if they lose their MaineCare benefits, and will then be "unable to pay for their medically necessary health care." *Pls.' Mot.* at 17.  It is the Plaintiffs' burden to persuade the Court that irreparable harm is likely to result if the Court does not issue a TRO.  The Court has no way of knowing whether "quickly" means within a week, a month, or a year.  To justify a TRO, "quickly" must mean that they are likely to suffer irreparable harm before the Court can rule on their motion for a preliminary injunction on a more fully-developed record; in short, almost immediately.  The Court concludes that the Plaintiffs have not carried their burden on this point.

The Plaintiffs cite *Mass. Association of Older Americans v. Sharp*, 700 F.2d 749 (1st Cir. 1983), in which the First Circuit wrote that "[t]ermination of benefits that causes individuals to forego [ ] necessary medical care is clearly irreparable injury." *Pls.' Mot.* at 15 (quoting *Sharp*, 700 F.2d at 753).  In that case, benefits had already been terminated, and the plaintiffs presented affidavits showing that "since termination, [they] have been financially unable to obtain necessary medical treatment." *Sharp*, 700 F.2d at 753.  The record in this case, however, as the Court has just discussed, is vague on when the March 1, 2013 amendment would cause the Plaintiffs to forego necessary medical care.  The Plaintiffs cite *Me. Association of Interdependent Neighborhoods v. Petit*, 647 F. Supp. 1312 (D. Me. 1986), as noting that "wrongful denial of Medicaid benefits causes irreparable harm." *Pls.' Mot.* at 15.  That case did not apply a bright-line rule—it held that "[t]he wrongful denial of

23

governmental benefits *may* constitute irreparable injury," *Petit*, 647 F. Supp. at 1315 (emphasis added)—and is distinguishable, as the plaintiff in that case asserted "that absent the requested injunction she will be forced to leave her family and enter a nursing home, irreparably injuring her physical and mental health." *Id.* The Plaintiffs in this case have not made the type of showing that justified the preliminary injunction in *Petit*.

### 3. Balance of the Equities

The Plaintiffs contend that the balance of the equities strongly favors granting the TRO, since "complying with the requirements of federal law cannot harm the Defendant." *Pls.' Mot.* at 18-19. This argument assumes that the Plaintiffs will prevail on the merits of their claim, but at this preliminary stage the ultimate disposition of the case remains uncertain, and the question is whether issuing the TRO would harm the Defendant assuming the Defendant prevails. The Secretary does not address this factor in her brief, and the record does not reveal what, if anything, it would cost the United States to vacate its approval of the March 1, 2013 amendment. It would likely impose costs on the state of Maine, which is facing a budget deficit, although this consideration fits more naturally under the fourth factor of the TRO analysis, since the state of Maine is not a party to this case.[7] There is no indication here, as there was in *Petit*, that "any payment

---

[7]     During the conference of counsel, the Secretary raised the point that the state of Maine, whose interests are implicated by this case, is not a party to the case. Although the Court understands the Secretary's concern, for the moment the Court must deal with the case as presented.

24

to Plaintiff[s] of Medicaid benefits later found to have been erroneous may be recovered pursuant to [federal law]." *Petit*, 647 F. Supp. at 1316.

In addition, Rule 65(c) conditions the issuance of a TRO on the movants' giving "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c).  Here, it appears unlikely that the Plaintiffs, who are proceeding in forma pauperis, could indemnify the United States as Rule 65(c) contemplates, and the Secretary does not argue for a bond.  *Def.'s Opp'n* at 21 n.7. The Court may waive the security requirement where the party seeking injunctive relief has shown "an extraordinarily high likelihood of success on the merits." *Petit*, 647 F. Supp. at 1319.   Here, however, the Plaintiffs have not established "an extraordinarily high likelihood of success on the merits."  *Id.*  The Court concludes that this factor does not clearly weigh for or against granting a TRO, since the costs to the United States are unclear.

### 4.   The Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.  The Plaintiffs argue that "[t]he public interest is served when laws passed by Congress are enforced."  *Pls.' Mot.* at 19.  This argument again assumes that the Plaintiffs will prevail in their interpretation of the maintenance of effort exception, but the Court has concluded that the Plaintiffs' likelihood of success on the merits is hard to predict with any confidence at this stage.  The Plaintiffs also contend that "[p]reserving [their] health, well-being, and

25

independence . . . is clearly in the public interest." *Pls.' Mot.* at 19.  Though correct, preserving the Plaintiffs' health and well-being comes at a cost and must be balanced against other public interests, one of which is solvency.  This balance must be struck through the political process, not by an order of this Court.

The Secretary points out that the state of Maine's request for an approval of its plan amendment was supported by a certification that the state of Maine was facing a budget deficit.  *Def.'s Opp'n* at 13.  The state of Maine's economic interests—and, by extension, the interests of all taxpayers within the state of Maine—are clearly at stake in this case, although the state of Maine is not a party to this proceeding, and there is no evidence of what a TRO would cost the state of Maine.  There is no indication that the state of Maine would be able to recover any MaineCare benefits paid as a result of the temporary restraining order if the Secretary prevails in her interpretation of the statute.  *Cf. Petit*, 647 F. Supp. at 1316.  The Court concludes that this factor is neutral given the lack of evidence and the inherently political nature of the analysis.

### 5.    Summary

Based on its analysis of each of the four factors, the Court concludes that the Plaintiffs have not carried their burden and denies their motion for a TRO.  It bears emphasis, however, that this decision is based largely on the procedural posture of the motion and the underdeveloped state of the record.  The parties will, in the coming days and weeks, have an opportunity to further develop the evidence and

their legal arguments, and this decision does not foreclose the possibility of preliminary injunctive relief.

In declining to issue a TRO, the Court has focused only on the very narrow time period between today and the date on which the Court is likely to rule on the Plaintiffs' motion for a preliminary injunction. The TRO is meant for emergencies; it is an extraordinary equitable measure used to forestall irreversible consequences and preserve the status quo for a fuller deliberation of the merits of the case. *See* 11A WRIGHT, MILLER & KANE § 2948.1, at 144-49 ("Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief"). While the Plaintiffs unquestionably face financial hardship, their case does not present the type of emergency that justifies a TRO.

## IV.    CONCLUSION

The Court DENIES the Plaintiffs' Motion for Temporary Restraining Order (ECF No. 14).[8]

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 28th day of February, 2013

---

[8]    The Court will schedule a telephone conference of counsel to discuss how the parties wish to proceed.