## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **LOUIS BOURGOIN, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 2:13-cv-00055-JAW** |
| | ) | |
| **KATHLEEN SEBELIUS, Secretary, U.S.** | ) | |
| **Department of Health and Human Services,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

STUART F. DELERY
Principal Deputy Assistant Attorney General
THOMAS E. DELAHANTY II
United States Attorney
JOHN G. OSBORN
Assistant United States Attorney
SHEILA LEIBER
Deputy Branch Director
CAROLINE LEWIS WOLVERTON
Senior Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
(202) 514-0265
caroline.lewis-wolverton@usdoj.gov

Dated: April 8, 2013                    Attorneys for Defendant Secretary Sebelius

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ...............................................................................................-ii-

INTRODUCTION ...............................................................................................................1

STATUTORY BACKGROUND .........................................................................................2

      I.      Medicaid Statute .................................................................................2

      II.     The Affordable Care Act Amendments to the Medicaid Statute ................3

PROCEDURAL BACKGROUND.......................................................................................6

ARGUMENT.......................................................................................................................9

      I.     Legal Standards .........................................................................................9

      II.    The Secretary's Determination that the MOE Exception Allows Maine's State Plan Amendment Should Be Upheld. ...............................................11

          A.   The Secretary Properly Determined that the SPA Satisfies the "Nonpregnant, Nondisabled Adults" Component of the MOE Exception…………………………………………………….... 11

          B.   The Secretary Properly Determined that the SPA Satisfies the Income Component of the MOE Exception………………………...15

      III.   Whether Maine is a Necessary Party that Should Be Joined. ...................19

CONCLUSION...................................................................................................................20

i

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(s)**

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837 (1984) .............................................................................................. passim

*Citizens to Preserve Overton  Park v. Volpe,*
401 U.S. 402 (1971) ...................................................................................................... 9

*Dickow v. United States,*
654 F.3d 144 (1st Cir. 2011) ....................................................................................... 10

*Dickson v. Hood,*
391 F.3d 581 (5th Cir. 2004) ....................................................................................... 10

*Fla. Power & Light Co. v. Lorion,*
470 U.S. 729 (1985) ...................................................................................................... 9

*Harris v. Olszewski,*
442 F.3d 456 (6th Cir. 2006) ....................................................................................... 10

*Jimenez v. Rodriguez-Pagan,*
597 F.3d 18 (1st Cir. 2010) ......................................................................................... 19

*Managed Pharmacy Care v. Sebelius,*
705 F.3d 934 (9th Cir. 2012) ................................................................................. 10, 13

*Marshall Cty. Health Care Authority v. Shalala,*
988 F.2d 1221 (D.C. Cir. 1993) ................................................................................... 9

*Massachusetts v. Sebelius,*
638 F.3d 24 (1st Cir. 2011) ........................................................................................... 7

*National Federation of Independent Bus. v. Sebelius,*
_ U.S. _, 132 S. Ct. 2566 (2012) ................................................................................. 4

*Olsen v. United States,*
414 F.3d 144 (1st Cir. 2005) ......................................................................................... 9

*Pharm. Research & Manufacturers of America v. Thompson,*
362 F.3d 817 (D.C. Cir. 2004) ................................................................................... 10

*Sierra Club v. Marsh,*
976 F.2d 763 (1st Cir. 1992) ....................................................................................... 10

*Simmons v. Galvin,*
575 F.3d 24 (1st Cir. 2009) ................................................................................................ 11

*Wilder v. Virginia Hospital Association,*
496 U.S. 498 (1990) ............................................................................................................ 2

## FEDERAL STATUTES

5 U.S.C. §§ 701-706 ........................................................................................................... 1

5 U.S.C. § 706(2) .............................................................................................................. 10

42 U.S.C. § 430.15(b) ......................................................................................................... 3

42 U.S.C. § 1395 *et seq.* ..................................................................................................... 7

42 U.S.C. § 1396 *et seq.* ..................................................................................................... 7

42 U.S.C. § 1396a(a)(74) ............................................................................................. passim

42 U.S.C. § 1396a ........................................................................................................ passim

42 U.S.C. § 1396c ............................................................................................................. 20

42 U.S.C. §1396d(p) ....................................................................................................... 6, 7

42 U.S.C. § 1396u-1 ........................................................................................................ 7, 8

42 U.S.C. § 1396u-3(a) ....................................................................................................... 7

42 U.S.C. § 18031(a) ........................................................................................................... 4

42 U.S.C. § 18041(c) ........................................................................................................... 4

## PUBLIC LAWS

Pub. L. No. 111-148, 124 Stat. 119 (2010) .............................................................. passim

## FEDERAL RULES OF CIVIL PROCEDURE

Rule 12(b)(6) ................................................................................................................. 9, 20

Rule 19 ....................................................................................................................... 19, 20

Rule 56 ......................................................................................................................... 9, 20

**INTRODUCTION**

Plaintiffs challenge the decision of the Secretary of Health and Human Services (the "Secretary") to approve an amendment submitted by the State of Maine to the plan governing its Medicaid program ("State plan").  The decision approves Maine's proposal to alter the eligibility criteria for certain groups receiving Medicare benefits who also receive subsidization for certain health care costs from Maine's Medicaid program.  Plaintiffs request judicial review of the Secretary's decision pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and claim that the Secretary's approval conflicts with the Medicaid statute's Maintenance of Effort ("MOE") requirement, 42 U.S.C. §§ 1396a(a)(74) and 1396a(gg), as added by the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010).  The MOE requirement generally precludes a state from making its eligibility "standards, methodologies or procedures" more restrictive.  The statute provides an exception to this prohibition that permits qualifying states to adopt more restrictive eligibility "standards, methodologies or procedures," but only with respect to "nonpregnant, nondisabled adults . . . whose income exceeds 133 percent of the [federal] poverty line."  42 U.S.C. § 1396a(gg)(3).

The Secretary's decision to approve Maine's amendment of its State plan should be upheld as consistent with the statutory MOE requirement as well as reasonable.  Because Medicaid eligibility criteria are established on a group basis, the Secretary interprets the MOE exception to permit a qualifying state to amend eligibility criteria if the amendment does not affect groups eligible for benefits based on pregnancy, disability, or status as a child, even if the amendment affects individuals who may fall within those groups but whose eligibility arises from other factors.  This interpretation is consistent with the statutory design of the Medicaid program to operate based on group eligibility and also consistent with the information available

1

to states through the eligibility process.  And while the Medicaid statute provides states with flexibility in methodologies for determining income eligibility, which can include state elections to disregard income, the Secretary interprets the MOE exception as not requiring states to apply those methodologies in complying with the exception's income component.  This interpretation comports with the plain language of the exception.  It is also consistent with the ACA's statutory design to provide continuity of coverage for the persons who were to be encompassed by the ACA's provision for mandatory Medicaid expansion—persons whose modified adjusted gross income is at or below 133 percent of the federal poverty line ("FPL").

For these reasons, elaborated upon below, Plaintiffs' challenge to the Secretary's decision to approve Maine's amendment of its State plan is without merit.  The Secretary's decision should be upheld under the APA and judgment entered in her favor.

## STATUTORY BACKGROUND

### I.    Medicaid Statute

"Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals."  *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 501 (1990).  A state's participation in Medicaid is voluntary, but if a state elects to participate it "must comply with certain requirements imposed by the [Social Security] Act and regulations promulgated by the Secretary."  *Id*. at 502. To receive federal financial assistance, a State plan and any amendments thereto must be approved by the Secretary.  *Id.*

Congress gave the Secretary the authority to administer the Medicaid program at the federal level, which includes reviewing State plans and any State plan amendment ("SPA") for compliance with federal law.  42 U.S.C. § 1396a(b).  The Medicaid statute provides that "[t]he

2

Secretary shall approve any plan which fulfils" the statutory requirements. *Id.* The Secretary delegated the responsibility and authority to approve State plans and SPAs to the CMS Administrator and the various Regional Administrators. *Id.* § 430.15(b); *accord* Decl. of Jennifer Ryan, Acting Director of the Children and Adults Health Programs Group, Center for Medicaid and CHIP Services, CMS ¶ 8 ("Ryan Decl.") (ECF No. 21-1 and Ex. A hereto).

The Medicaid statute authorizes states to cover groups of individuals in their State plans. *See id.* § 1396a(a)(10); *accord* Ryan Decl. ¶ 19. Mandatory groups (such as aged, blind or disabled individuals receiving supplemental security income (SSI), or low-income pregnant women) that are identified in 42 U.S.C. § 1396a(a)(10)(A)(i) must consist of "all individuals" identified in the group. *Id.* § 1396a(a)(10)(A)(i) (listing groups that must be covered by a State plan). Optional groups must be made eligible on the basis of a "group or groups," except that a State plan may elect to cover "reasonable categories" of children. *Id.* § 1396a(a)(10)(A)(ii) (listing groups that a state may cover).

## II.    The Affordable Care Act Amendments to the Medicaid Statute

Three of the varied objectives of the ACA are relevant to this case: expanding Medicaid coverage to ensure eligibility for all individuals (including single adults) at the lowest income level; maintaining existing Medicaid eligibility afforded by states at the time of the ACA's enactment for those who were going to be covered in 2014 by the ACA's expanded eligibility requirements; and establishing a uniform methodology for determining income.

1. Medicaid expansion. Prior to the ACA, Medicaid eligibility was limited to individuals who fit in certain specified categories, such as children, parents, pregnant women, and aged, blind or disabled individuals. The ACA expanded Medicaid eligibility to include individuals who were not in any such categories by establishing an eligibility group for low income adults

under age 65 with incomes under 133 percent of the FPL.  Pub. L. No. 111-148, § 2001(a).  As a result, as of January 1, 2014, state Medicaid plans would be required to cover all persons whose incomes are at or below 133 percent of the federal poverty level ("FPL").  *Id.*  Based on the Supreme Court's conclusion that this expansion of Medicaid eligibility to all low-income adults constituted a comprehensive new program, the Court held that the federal government cannot withhold Medicaid funds from states that do not elect to implement this expansion."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, _ U.S. _, 132 S. Ct. 2566, 2605–07 (2012).

2.  Maintenance of Effort.  The ACA included an MOE provision that requires continuity of Medicaid coverage for adults until the date health insurance exchanges are to be fully operational,[1] which is January 1, 2014.[2]  Pub. L. No. 111-148 § 2001(b), *codified at* 42 U.S.C. § 1396a(gg).  This is also the date by which the Medicaid expansion was to have been required.  Pub. L. No. 111-148 § 2001(a)(1), *codified at* 42 U.S.C. § 1396a(a)10(A)(i)(VIII).  Under the MOE provision, a state may not alter the "eligibility standards, methodologies, or procedures under the State [Medicaid] plan" so as to make them "more restrictive than the eligibility standards, methodologies, or procedures [] under the plan . . . that [were] in effect on March 23, 2010" until the state has in place a fully operational health insurance exchange (whether federally or state operated) as required by the ACA.  42 U.S.C. § 1396a(gg)(1).  The MOE

---

[1] The ACA provides that states may receive certain federal grant funds for state activities related to the establishment of health insurance exchanges if they establish by January 1, 2014, an exchange through which persons without access to affordable health insurance would be able to purchase coverage.  Pub. L. No. 111-148 § 1311(a); *codified at* 42 U.S.C. § 18031(a).  For states that do not elect to establish a health insurance exchange, the ACA provides for a federal health insurance exchange.  Pub. L. No. 111-148 § 1321(c); *codified at* 42 U.S.C. § 18041(c).

[2] The MOE provision extends this date until October 1, 2019 for children.  42 U.S.C. § 1396a(gg)(2).

provision thus was designed to prevent states from dropping from Medicaid coverage adult groups that would, after January 1, 2014, be covered through Medicaid expansion.[3]

The MOE provision includes a "nonapplication" provision, or exception. Under the exception, if a state certifies that for the current or a succeeding fiscal year it has or projects a budget deficit, until December 31, 2013, the state may make eligibility standards, methodologies or procedures more restrictive, but only for "nonpregnant, nondisabled adults . . . whose income exceeds 133 percent of the [federal] poverty line . . . applicable to a family of the size involved."[4] *Id.* § 1396a(gg)(3).

3. Uniform methodology for calculating income. To establish consistency in eligibility determinations under the Medicaid program, as well as in health insurance exchanges, the ACA provided that effective January 1, 2014, household income will be determined using modified adjusted gross income.[5] Pub. L. No. 111-148 § 2002, *codified at* 42 U.S.C. § 1396a(e)(14). As of the filing of this motion and memorandum, subsection (e)(14) can be found in the notes to 42 U.S.C.A. § 1396a.

---

[3] It further provided that states could not drop children from Medicaid coverage until September 30, 2019. 42 U.S.C. § 1396a(gg).

[4] The full text of the MOE exception is as follows:

> During the period that begins on January 1, 2011, and ends on December 31, 2013, the requirement under paragraph (1) shall not apply to a State with respect to nonpregnant, nondisabled adults who are eligible for medical assistance under the State plan or under a waiver of the plan at the option of the State and whose income exceeds 133 percent of the poverty line (as defined in section 1397jj(c)(5) of this title) applicable to a family of the size involved if, on or after December 31, 2010, the State certifies to the Secretary that, with respect to the State fiscal year during which the certification is made, the State has a budget deficit, or with respect to the succeeding State fiscal year, the State is projected to have a budget deficit. Upon submission of such a certification to the Secretary, the requirement under paragraph (1) shall not apply to the State with respect to any remaining portion of the period described in the preceding sentence.

42 U.S.C. § 1396a(gg)(3).

[5] Subsection (e)(14) defines modified adjusted gross income according to the Internal Revenue Code definition. 42 U.S.C. § 1396a(e)(14)(G) ("In this paragraph, the terms 'modified adjusted gross income' . . . ha[s] the meaning[] given such term[] in section 36B(d)(2) of the Internal Revenue Code of 1986.").

A major impact of the change to modified adjusted gross income is that states will no longer calculate income using "block income disregards" that they previously could elect to apply under 42 U.S.C. § 1396a(r)(2).  Prior to the change, because income eligibility standards were often specified in the Medicaid statute (for example, the standard for Qualified Medicare Beneficiaries (QMBs) is fixed by statute at 100 percent of the FPL, *id.* § 1396d(p)), states that wished to adopt an income standard that was effectively higher than the statutorily specified level could elect to disregard, for example, income between the statutorily specified level and the desired higher level (for example, disregarding income between 100 and 150 percent of the FPL in determining QMB eligibility).  Congress recognized in the ACA that these block income disregards were a means to change the effective income eligibility standard, and not a measure of actual income.  *See* Pub. L. No. 111-148 § 2002(a).  But because states have used different block income disregards, the manner in which State plans have articulated their income eligibility standards has not been uniform.  With 42 U.S.C. § 1396a(e)(14)(A), Congress directed states to establish new income thresholds for populations eligible for Medicaid using modified adjusted gross income and household income "that are not less than the effective income eligibility levels that applied" on the date of enactment of the ACA.[6]

## PROCEDURAL BACKGROUND

On August 1, 2012, Maine requested approval of a SPA that would make eligibility standards for inclusion in the "Medicare buy-in groups" more restrictive—SPA #12-010.  *See* Administrative Record ("A.R.") at 226–250 (ECF No. 32).  Medicare buy-in groups are groups of Medicare beneficiaries for which state Medicaid programs pay certain Medicare premiums,

---

[6] In developing these new income thresholds, states are required to take into account block income disregards because their purpose was to change the effective eligibility standard.  *See* Letter from Cindy Mann, Director, Center for Medicaid and CHIP Services, to State Health Officials at 1 ( Dec. 28, 2012) *available at* http://www.medicaid.gov/Federal-Policy-Guidance/downloads/SHO12003.pdf.

deductibles and coinsurance costs (referred to as Medicare cost sharing).[7] *See* Ryan Decl. ¶ 15. Relevant to this case are three Medicare buy-in groups, each of whose eligibility is based on income level:  QMBs have incomes at or below 100% of the FPL, 42 U.S.C. § 1396d(p); Specified Low-income Medicare Beneficiaries (SLMBs) have incomes below 120% of the FPL, *id.* § 1396a(a)(10)(E)(iii); and Qualifying Individuals (QIs) have incomes below 135% of the FPL, *id.* § 1396a(a)(10)(E)(iv), 1396u-3(a)).  *Accord* Ryan Decl. ¶ 15.  Maine's proposed SPA reduced the income level for eligibility in each of the three Medicare buy-in groups by lowering the amount of income disregarded in determining eligibility for each group.  A.R. at 227–228. At the time the ACA was passed, Maine applied a 50% income disregard to each group, and with the SPA Maine sought to reduce the disregard for each group by 10% of the FPL.  *Id.* at 227. The SPA thus proposed to reduce the amount of income Maine disregards in determining Medicare buy-in group eligibility as follows:  for QMBs, the difference between 100% and 140% of the FPL (instead of between 100% and 150%); for SLMBs, the difference between 120% and 160% of the FPL (instead of between 120% and 170%); and for QIs, the difference between 135% and 175% of the FPL (instead of the difference between 135% and 185%).  *Id.* at 227–28.  The proposed SPA also sought to change eligibility criteria for the group of children and the groups of parents and caretaker relatives whose income is at or below 133 percent of the FPL, eliminate Maine's optional group of parents and caretaker relatives, and reduce the income eligibility standard for Maine's basic eligibility groups for parents and children (the "Section 1931 group" under 42 U.S.C. §§ 1396a(a)(10)(A)(i) and 1396u-1).  A. R. at 226–227.  Maine provided a certification of a projected budget deficit as support for its proposed SPA.  *Id.* at 250.

---

[7] "Medicare is a health insurance program for those who are over age 65 or have certain [permanent] disabilities.  . . . By contrast, Medicaid is a health insurance program for low-income individuals; it is funded by both the federal government and state governments." *Massachusetts v. Sebelius*, 638 F.3d 24, 26 (1st Cir. 2011) (citing 42 U.S.C. § 1395 *et seq.* and 42 U.S.C. § 1396 *et seq.*, respectively).

Maine subsequently split its proposed SPA into two separate SPA proposals:  SPA #12-010 and SPA #12-010A.  *Id.* at 18–20, 52–60.  SPA #12-010 proposed to change eligibility criteria for parents, caretaker relatives and caretakers whose income is at or below 133 percent of the FPL.  *Id.* at 10–13.  SPA #12-010A proposed to change Maine's methodology for determining income eligibility for "Medicare buy-in groups" as described immediately above, as well as eliminate Maine's optional group of parents and caretaker relatives and reduce the income eligibility standard for the Section 1931 group down to (but not below) an effective level of 133 percent of the FPL.[8]  *Id*. at 18–20, 52–60.

On January 7, 2013, HHS on behalf of the Secretary approved SPA #12-010A, the SPA concerning Medicare buy-in groups as well as the optional group of parents and caretaker relatives and the Section 1931 group with respect to individuals with incomes above 133 percent of the FPL.[9]  A.R. 7–9.  Also on January 7, 2013, HHS disapproved SPA 12-010, the SPA concerning parents, caretaker relatives and children whose incomes are at or below 133 percent of the FPL.[10]  *Id*. 10–14.  The Secretary's approval of SPA #12-010A is the subject of this suit.

On February 20, 2013, Plaintiffs filed the Complaint, asserting that the Secretary's approval of SPA #12-010A concerning the Medicare buy-in groups exceeded her statutory authority and should be vacated under the APA.  Compl. ¶ 72 & Request for Relief (ECF No. 1).  Plaintiffs allege that they are Medicare beneficiaries who were eligible for the above-described Medicare buy-in groups under the eligibility standards in place on March 23, 2010, but have

---

[8] Some of the individuals affected by the elimination of the optional group of parents and caretaker relatives nevertheless remain eligible for Medicaid because SPA #12-010A also expanded the eligibility criteria for parents and caretaker relatives in the Section 1931 group by increasing disregards to result in coverage for individuals with incomes up to 133% of the FPL.

[9] Plaintiffs' prayer for relief in the form of an order vacating SPA #12-010A in its entirety is therefore overbroad insofar as it seeks relief affecting the groups other than the Medicare buy-in groups.

[10] Maine has requested reconsideration of the disapproval of SPA #12-010 under 42 U.S.C. § 1316(a)(2).

been notified by Maine that they are not eligible for the groups under SPA #12-010A. *See id.* ¶¶ 2–3. They allege that they are disabled but not that they are part of a group that is eligible for Medicaid on the basis of disability. *See generally* Compl. On February 21, 2013, Plaintiffs moved for a temporary restraining order ("TRO") and preliminary injunction ("PI") as well as class certification.[11] (ECF Nos. 13 & 14, respectively) On February 28, 2013, the Court denied the motion for TRO. (ECF No. 23) On March 18, 2013, the Secretary filed the administrative record for her decision to approve SPA #12-010A. (ECF No. 32)

## ARGUMENT

### I.     Legal Standards

Plaintiffs seek judicial review of the Secretary's decision to approve SPA #12-010A based on the APA. Compl. ¶¶ 71–72. In an APA action for judicial review, a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, for summary judgment under Rule 56 based on the administrative record is an appropriate mechanism for resolving the action. *See Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) (recognizing that in reviewing agency action "[t]he entire case on review is a question of law, and only a question of law," that "because a court can fully resolve any purely legal question on a motion to dismiss, there is no inherent barrier to reaching the merits at the 12(b)(6) stage," and that "there is no real distinction in [the APA] context between the question presented on a 12(b)(6) motion and a motion for summary judgment").

Under the APA, a court reviews an agency decision based on the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)); *Olsen v. United States*, 414 F.3d 144, 155 (1st Cir.

---

[11] If this action proceeds beyond this motion and Plaintiffs' forthcoming motion for summary judgment, the Secretary will respond separately to the Motion for Class Certification on a schedule to be determined after discussion among the parties and with the Court.

2005).  Courts may also consider an agency official's affidavit or declaration that provides additional explanation of the decision.  *Sierra Club v. Marsh*, 976 F.2d 763, 772 (1st Cir. 1992).  An agency decision should be upheld unless it is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law."  5 U.S.C. § 706(2).

The Secretary's interpretation of the MOE exception in connection with her decision to approve SPA #12-010A is reviewed based on the principles set forth in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).  *See, e.g.*, *Dickow v. United States*, 654 F.3d 144, 149 (1st Cir. 2011).  Under "step one" of the *Chevron* analysis, the Court asks first "if Congress has addressed the precise question at issue."  *Dickow*, 654 F.3d at 149 (citing *Chevron*, 467 U.S. at 842).  "If the intent of Congress is clear, that is the end of the matter."  *Chevron*, 467 U.S. at 842.  If the Court finds that Congress' intent is not clear from the statute, it proceeds to "step two" of the *Chevron* analysis and considers "whether the agency's chosen interpretation is a 'reasonable interpretation' of the enacted text."  *Dickow*, 654 F.3d at 149 (quoting *Chevron*, 467 U.S. at 844).

Under *Chevron* step two, because the Secretary's decision to approve a SPA is an exercise of her interpretive authority expressly delegated by Congress under the Medicaid statute, 42 U.S.C. § 1396a(b), it is entitled to "*Chevron* deference."  *Managed Pharmacy Care v. Sebelius*, 705 F.3d 934, 946 (9th Cir. 2012); *Harris v. Olszewski*, 442 F.3d 456, 467 (6th Cir. 2006); *Dickson v. Hood*, 391 F.3d 581, 595–96 (5th Cir. 2004); *Pharm. Research & Mfrs. of Am. v. Thompson*, 362 F.3d 817, 821–22 (D.C. Cir. 2004). Accordingly, the Secretary's decision to approve SPA #12-010A should be upheld so long as it is reasonable.  *Chevron*, 467 U.S. at 844.

Lastly, "[i]n examining [a statutory section], [courts] are required to comply with 'the cardinal rule that a statute is to be read as a whole[.]'" *Simmons v. Galvin*, 575 F.3d 24, 35 (1st Cir. 2009). "As 'the meaning of statutory language, plain or not, depends on context, . . . [courts] must 'look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.'" *Id.* (quoting *King v. St. Vincent's Hosp.* 502 U.S. 215, 221 (1991), and *Dada v. Mukasey*, 554 U.S. 1, 16 (2008), respectively).

## II.   The Secretary's Determination that the MOE Exception Allows Maine's State Plan Amendment Should Be Upheld.

### A.   The Secretary Properly Determined that the SPA Satisfies the "Nonpregnant, Nondisabled Adults" Component of the MOE Exception.

Consistent with the fundamental canon of statutory interpretation that a statutory provision should be read in the context of the larger statute, the MOE provision regarding continued Medicaid eligibility is properly read in the context of the larger Medicaid statute. *See Simmons*, 575 F.3d at 35. Because the Medicaid statute structures Medicaid eligibility according to membership in specified eligibility groups, the Secretary properly interpreted the MOE exception's reference to "nonpregnant, nondisabled adults" to refer to groups not eligible for Medicaid on the basis of pregnancy, disability or status as a child. Here, eligibility for the buy-in program was determined on the basis of membership in a group consisting of those entitled to or eligible for Medicare (regardless of the reason) with specified levels of income.

The Medicaid statute authorizes State plans to cover various groups of individuals and establishes requirements to be applied on the basis of group eligibility. 42 U.S.C. § 1396a(a)(10), 1396a(a)(17), 1396a(r)(2); *see also* Ryan Decl. ¶¶ 19–20 (discussing statutory provisions). For example, as discussed above mandatory groups like groups of aged, blind or disabled individuals receiving supplemental security income must consist of "all individuals"

11

identified in the group, and optional groups must be determined eligible on the basis of a "group or groups." 42 U.S.C. § 1396a(a)(10)(A)(i)–(ii). The statute requires State plans, among other things, to include reasonable standards that are "comparable for all groups." *Id.* § 1396a(a)(17) and (r)(2). The Medicaid statute does not authorize coverage of subgroups, with a single limited exception for "reasonable categories" of children. *See* Ryan Decl. ¶ 19. Thus, with respect to the Medicare buy-in groups at issue here, the Medicaid statute authorizes a State plan like Maine's to cover the entire population of QMBs, SLMBS or QIs but not to cover subgroups of those populations, e.g., only those QMBs, SLMBS and QIs who are entitled to or eligible for Medicare Part A or Part B based on a finding of permanent disability. [12] *See id.* ¶ 21.

It would be inconsistent with the purpose of the MOE exception to interpret it as precluding states from amending their eligibility "standards, methodologies or procedures" for any group that could have a disabled or pregnant person in it. Such an interpretation would render the exception meaningless and therefore cannot be interpreted as Congress' intent. Any eligibility group could include someone who is disabled or pregnant. For example, a person could become pregnant or disabled after qualifying for an eligibility group on some other basis. Further, states may not have information indicating whether individuals in Medicare buy-in groups are qualified for Medicare based on disability because disability is only one of several bases on which an individual may be entitled to or eligible for Medicare. *Id.* ¶ 26. They may have no information on whether, for example, individuals eligible as parents may also have a

---

[12] The characterization of the MOE exception by Senator Grassley, sponsor of the amendment providing the MOE exception, that Plaintiffs cited in the motion for TRO and PI refers to the "population" or "group" basis on which Medicaid eligibility determinations are made. *See* Tr. of Exec. Comm. Meeting to Consider Health Care Reform at 192 (Oct. 1, 2009), available at http://www.finance.senate.gov/library/transcripts/?c=111 (Statement of Senator Grassley) (proposing MOE exception so as to provide that "[t]he States may only drop non-disabled, nonpregnant adult Medicaid *populations* if they are running deficits or are projected to run deficits") (cited in Pls.' Mot. for TRO and PI at 12–13) (emphasis supplied).

disability or may also be pregnant.  Nor would a state necessarily have information on whether an individual eligible based on Medicare entitlement would have a condition meeting the state's definition of disability or may also be pregnant.[13]

Even if the Medicaid statute does not plainly compel the Secretary's interpretation, the group structure of the Medicaid program described immediately above certainly supports the interpretation.  Thus, even assuming that the statutory text's reference to "nonpregnant, nondisabled adults" is ambiguous, under step two of the *Chevron* analysis, the Secretary's decision should be upheld as a reasonable interpretation of the MOE exception.  Her interpretation that the MOE requirement applies to groups is demonstrated by her decision to disapprove SPA #12-010 on the ground that it proposed to eliminate "populations that ha[d] long been covered by the state's Medicaid program" and were not encompassed by the MOE exception.  A.R. at 12–13.  The Secretary's interpretation expressed in the disapproval is entitled to *Chevron* deference.  *See, e.g.*, *Managed Pharmacy Care*, 705 F.3d at 945 (citing *Alaska Dep't of Health and Soc. Servs. v. CMS*, 424 F.3d 931, 940 (9th Cir. 2005)).

Further, CMS's interpretation of the Medicaid statute as allowing state plans to cover the entire population of Medicare buy-in groups but not permitting coverage of subgroups of that population is longstanding.  Ryan Decl. ¶ 21.  It is also consistent with CMS' guidance to state Medicaid directors that Plaintiffs' motion for TRO and PI cited, which directs states to ensure that application of more restrictive eligibility provisions "would not result in the loss of

---

[13] While individuals under age 65 who receive Medicare benefits likely have been determined for Medicare purposes to have a disability, they are not determined eligible for Medicaid based on a disability.  In some states, referred to as "209(b) states" the standards for disability may be more restrictive under Medicaid than under Medicare.  42 U.S.C. § 1396a(f).  While Maine is not a 209(b) state, individuals with a disability in the Medicare buy-in groups are eligible based on entitlement in Medicare, rather than based on disability, and constitute only a fraction of the overall Medicare buy-in group.  *See* U.S. Census Bureau, Statistical Abstract of the United States: 2012, Table 146 (131st ed., Jan. 2013), available at http://www.census.gov/compendia/statab/2012/tables/12s0146.pdf.

eligibility for individuals who are eligible *based on* pregnancy or disability . . ." Letter from CMS to State Medicaid Directors of Feb. 25, 2011, Enclosure A, Q5 Answer, available at http://downloads.cms.gov/cmsgov/archived-downloads/SMDL/downloads/smd11001.pdf (cited in Pls.' Mot. for TRO and PI at 14) (emphasis supplied). This language does not encompass individuals who are eligible on some other basis but also happen to be pregnant or disabled. And CMS's interpretation of the MOE exception is comparable to its interpretation of the MOE requirement that applies to children under the Children's Health Insurance Program. Ryan Decl. ¶ 25. Acting Director Ryan additionally explains that "because in CMS's experience the vast majority of any group that is not eligible for Medicaid as a result of a finding of disability is not disabled, CMS concluded that that it would be contrary to the intent of Congress to apply the MOE requirement to groups that, like any Medicare-based eligibility group, undoubtedly contain a majority of nondisabled adults, in circumstances in which states could otherwise qualify for non-application based on their budget deficits."[14] *Id.* ¶ 22.

As set forth above, Plaintiffs are not part of a group deemed eligible for Medicaid based on disability, pregnancy or status as a child, but rather were eligible for the Medicare buy-in program on the basis of their having been entitled to or eligible for Medicare and having income below a certain level. The Secretary therefore properly concluded that they are "nonpregnant, nondisabled adults" within the meaning of the MOE exception. [15]

---

[14] Indeed, data from the 2010 U.S. Census shows that between 1990 and 2010 the percentage of Medicare enrollees whose eligibility was based on disability was less than 17 percent. U.S. Census Bureau, Statistical Abstract of the United States: 2012, Table 146, *supra* n.13.

[15] Acting Director Ryan's Declaration explains that a contrary interpretation expressed in an April 2011 email from HHS' Boston Regional Office, A.R. at 260, was part of an open dialogue with Maine and did not reflect a final decision of the Secretary. Ryan Decl. ¶ 24. The April 2011 email therefore is not properly construed as an inconsistent interpretation of the Secretary.

**B.      The Secretary Properly Determined that the SPA Satisfies the Income Component of the MOE Exception.**

The MOE exception applies to nonpregnant, nondisabled adults "whose income exceeds 133 percent of the [FPL]."  42 U.S.C. § 1396a(gg)(3).  The Secretary's conclusion that SPA #12-010A makes eligibility standards more restrictive only for groups whose income exceeds 133 percent of the FPL as required by this provision should be upheld under *Chevron*'s step one.

CMS interprets the "income [that] exceeds 133 percent of the poverty line" component of the MOE exception to refer to income calculated without State income disregards.  Ryan Decl. ¶¶ 27–30.  This interpretation is consistent with the statutory reference to "income."  42 U.S.C. § 1396a(gg)(3).  The statute does not state or otherwise indicate that "income" must be calculated after certain portions of an individual's actual income are disregarded as they were in Maine for purposes of eligibility determinations on the date of enactment of the ACA, contrary to the argument that Plaintiffs have advanced, *see* Pls.' Mot. for TRO and PI at 14.

Interpreting the income component of the MOE exception according to income without regard to block income disregards also is consistent with the statutory scheme of the ACA with respect to Medicaid.  As described above, under the ACA persons with incomes at or below 133 percent of the FPL were to be eligible for Medicaid under the ACA's mandatory Medicaid expansion provision that was to have taken effect on January 1, 2014.  Pub. L. No. 111-148 § 2001(a).  The MOE exception prevents states from dropping from their Medicaid plans persons with incomes at or below 133 percent of the FPL.  *Id.* § 2001(b).  And the ACA provides for states to determine income for eligibility and other purposes under State plans according to the modified adjusted gross income methodology, which does not factor in the block income disregards states may have elected to apply in determining eligibility.  *Id.* § 2002.

15

It makes sense to conclude that the 133 percent of the FPL in the Medicaid expansion provision and the 133 percent of the FPL in the MOE nonapplication provision are intended to be the same, *viz.*, 133 percent of the FPL as determined by modified adjusted gross income, and that the provisions are intended to work together to provide continuity of Medicaid coverage for those who were to be covered by Medicaid expansion.  The Medicaid expansion provision and the MOE nonapplication provision are in adjacent subsections of Section 2001 of the ACA.  Pub. L. No. 111-148 § 2001(a) and (b).  Section 2001 is titled "Medicaid Coverage for the Lowest Income Populations."  *Id.* § 2001.  And the MOE's nonapplication provision applies "[d]uring the period that begins on January 1, 2011, and ends on December 31, 2013," *id.* § 2001(b)(2), the latter being the date after which the Medicaid expansion provision was to have become effective, *id.* § 2001(a)(1).  The Medicaid expansion provision and the MOE nonapplication provision thus evidence a congressional intent that together they provide a continuity of Medicaid coverage so that groups covered by a State plan as of March 23, 2010 and that would be required to be covered by a State plan as a result of Medicaid expansion on January 1, 2014 would not be dropped from the State plan in the interim.  Accordingly, the MOE exception reflects Congress' intention that states not conserve funds by dropping coverage for persons who were to be eligible for Medicaid under the mandatory expansion provision of the ACA as enacted, i.e. those with incomes below 133 percent of the FPL as determined by modified adjusted gross income (in addition to children, pregnant women and the disabled).[16]

---

[16] Statements of Senators Grassley and Snowe reflect this linkage between the 133 percent of the FPL ceiling for Medicaid expansion and the 133 percent FPL threshold of the MOE exception.  Tr. of Exec. Comm. Meeting to Consider Health Care Reform at 316:15 to 318:5 (Sept. 30, 2009), available at http://www.finance.senate.gov/library/transcripts/?c=111 (Statement Senator Grassley) ("The [ACA bill] has a mandatory expansion of the Medicaid program to 133 percent of Federal poverty.  . . . The [bill] also requires States to maintain existing eligibility levels for all Medicaid populations upon enactment. This [MOE] provision would expire in 2014.  The goal is to preserve coverage in Medicaid until States are ready to expand.  . . . [M]y amendment recognizes [the] fiscal challenge facing [some] states.  My

Also significantly, the statutory MOE provision provides explicitly that states are not required to apply the income disregards they may utilize in determining eligibility for purposes of the MOE exception.  Subsection (gg)(4) specifies that for purposes of complying with the MOE requirement a state can determine income according to modified adjusted gross income: "[a] State's determination of income in accordance with subsection (e)(14) shall not be considered to be eligibility standards, methodologies, or procedures that are more restrictive than the standards, methodologies, or procedures in effect under the State plan . . . on March 23, 2010 for purposes of determining compliance with the requirements of paragraph (1), (2), or (3)." 42 U.S.C. § 1396a(gg)(4)(A).  Paragraph (3) is the MOE exception, *id.* § 1396a(gg)(3).  In other words, the statute expressly provides that if a State determines income using the modified adjusted gross income, it will not run afoul of the MOE's income requirement.  Even though the subsection *requiring* use of modified gross adjusted income does not become effective until January 1, 2014, the MOE provision authorizes states to apply it for MOE purposes prior to that date.  *Id.* § 1396a(gg)(4).

Thus, even if the Court were to find the MOE exception's reference to "income" to be ambiguous, the Secretary's interpretation is a reasonable construction of the statute.  Her interpretation therefore should be afforded deference and upheld under step two *Chevron* analysis.

Under the interpretation that Plaintiffs advance, in contrast, the MOE exception would apply only to QIs (one of the three Medicare buy-in groups) with incomes between 133 and 135 percent of FPL after significant income disregards.  As referenced above, the Medicare statute

amendment would strike the [MOE] for adult populations above 133 percent of poverty."); *id.* at 319:23 to 322:2 (Statement of Senator Snowe) (recognizing that "[w]e want to expand coverage in a way that is affordable to States" and arguing that the MOE requirement should not "impos[e] a fiscal burden on States that have made a decision to expand their populations above 133 percent").

17

provides that QIs have incomes below 135% of the FPL, while QMBs have incomes at or below 100% of the FPL and SLMBs have incomes below 120% of the FPL. *Supra* at 6–7; *accord* Ryan Decl. ¶ 29. Such an interpretation would not allow states the opportunity for fiscal relief that the MOE exception is intended to provide. *See also* Ryan Decl. ¶ 29 (Plaintiffs' interpretation would render the MOE exception "almost meaningless"). Nor would it ensure a smooth transition to expanded Medicaid eligibility after December 31, 2013, because as of that date the income disregards will not be taken into account in determining Medicaid eligibility.

Also, some states, like Maine, have used block income disregards to achieve higher effective income eligibility standards than required by statute. Plaintiffs' interpretation could result in widely varying applications of the MOE requirement, with states that chose to apply larger, more generous disregards being able to conserve far fewer funds via the MOE exception than states that chose to apply smaller, less generous disregards. In addition to being inconsistent with Congress' intent for continuity of coverage such a result would be inequitable.[17]

Further, the contrary interpretation offered by Plaintiffs in their motion for TRO or PI— that the income disregards utilized in determining Medicaid eligibility must be factored into the determination of whether the MOE exception applies—relies on reasoning that is circular. To be sure, the MOE requirement prevents states from changing "eligibility standards, methodologies, or procedures" so as to make them more restrictive. 42 U.S.C. § 1396a(gg)(1). The MOE exception, however, lifts this prohibition and allows a state to change its "eligibility standards, methodologies and procedures" so as to make them more restrictive so long as the change impacts only nonpregnant, nondisabled adults whose income is above 133 percent of the FPL.

---

[17] Senator Snowe specifically advocated for passage of the MOE requirement to prevent such an "inequity." Tr. of Executive Committee Meeting to Consider Health Care Reform at 323:22 to 324:1, *supra* n.16 (Statement of Senator Snowe).

18

*Id.* § 1396a(gg)(3).  Plaintiffs' interpretation in effect incorporates (a) the existing "eligibility standards, methodologies and procedures" that the MOE exception allows states to lift into (b) the determination of whether the exception applies, the very exception that allows states to lift the existing "eligibility standards, methodologies and procedures."  That circular reasoning should be rejected.

**III.    Whether Maine is a Necessary Party that Should Be Joined.**

During the March 8, 2013 telephone conference among the Court and the parties, the Court requested that the parties address in their briefing on their respective dispositive motions whether the State of Maine is a necessary party under Federal Rule of Civil Procedure 19.

"Rule 19 is designed to protect the interests of parties who are not yet involved in ongoing litigation."  *Jimenez v. Rodriguez-Pagan*, 597 F.3d 18, 25 (1st Cir. 2010).  It is therefore significant that Maine has not elected to intervene or otherwise participate in this action although, as stated by counsel during the March 8, 2013 telephone conference with the Court, it has been notified of this action.

Rule 19(a) establishes the criteria for when a third party is required to be joined to an action if feasible, *viz.*, is "necessary":

> A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>
> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>
> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

19

Fed. R. Civ. P. 19(a)(1).[18]  The Rule further provides that "[i]f a person has not been joined as required, the court must order that the person be made a party."  Fed. R. Civ. P. 19(a)(2).

With respect to Rule 19(a)(1)(A), Maine's presence would not be necessary to effect the relief that the Complaint seeks:  vacatur of the Secretary's approval of SPA #12-010A.  *See* Compl., Prayer for Relief ¶ D.  However, in the event that the Court rejected the Secretary's arguments above and vacated the Secretary's SPA approval but Maine did not reinstate the populations that were dropped under the SPA following such a vacatur, the Secretary's only enforcement authority would be to bring a compliance action, which is committed to her discretion.  *See* 42 U.S.C. § 1396c.  And, even if the Secretary chose to pursue this course, the compliance proceedings would be lengthy and only prospective relief in the form of a funding cut-off would be available.

It would not appear that Maine is a necessary party under Rule 19(a)(1)(B).  To be sure, as undersigned counsel previously observed, the circumstances of the case suggest that Maine might wish to participate in order to protect its interest vis-à-vis the SPA since Maine requested that the Secretary approve it.  However, because the Secretary is already defending her decision to approve the SPA, Maine's absence as a practical matter does not leave its interests concerning the SPA unprotected.  Nor would a ruling upholding or vacating the Secretary's approval of the SPA leave the existing parties subject to inconsistent obligations.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, enter summary judgment in favor of the Secretary pursuant to Rule 56 of the Federal Rules of Civil Procedure.

---

[18] Rule 19(b) establishes the factors a court considers in determining whether an action must be dismissed where joinder of a necessary person is not feasible.

20

Respectfully submitted this 8th day of April, 2013.

Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General
THOMAS E. DELAHANTY II
United States Attorney
JOHN G. OSBORN
Assistant United States Attorney
SHEILA LEIBER
Deputy Branch Director

/s/Caroline Lewis Wolverton
CAROLINE LEWIS WOLVERTON
Senior Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
(202) 514-0265
caroline.lewis-wolverton@usdoj.gov

Dated: April 8, 2013                    Attorneys for Defendant Secretary Sebelius

21

## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 8, 2013, I electronically filed the foregoing Defendant's Motion to Dismiss or, in the Alternative, For Summary Judgment and Supporting Memorandum of Law with the Clerk of Court using the CM/ECF system which will send notifications of such filing to the following:

Jack Comart
Maine Equal Justice Partners
126 Sewall Street
Augusta, ME 04330
(207) 626-7058
jcomart@mejp.org

Jane Perkins
National Health Law Program
101 E. Weaver St., Suite G-7
Carrboro, NC 27150
(919) 968-6308 (x102)
perkins@healthlaw.org

Alice Bers
Center for Medicare Advocacy
PO Box 350
Willimantic, CT 06226
(860) 456-7790
gdeford@medicareadvocacy.org
abers@medicareadvocacy.org

/s/Caroline Lewis Wolverton
CAROLINE LEWIS WOLVERTON
Senior Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
(202) 514-0265
caroline.lewis-wolverton@usdoj.gov

22