UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

LOUIS BOURGOIN, et al.      )
                             )
         Plaintiffs,      )
    v.                    )      2:13-cv-00055-JAW
                             )
KATHLEEN SEBELIUS, Secretary,  )
United States Department of Health  )
and Human Services,      )
                             )
        Defendant.     )

## ORDER ON DISPOSITIVE MOTIONS

In this case, recipients of Medicaid benefits contend that a recent amendment to the state of Maine's Medicaid plan that reduced or terminated their benefits does not comply with the "maintenance of effort" requirement of the Patient Protection and Affordable Care Act. The Secretary of the United States Department of Health and Human Services, who approved the plan amendment and is the only Defendant, moved to dismiss under Rule 12(b)(6), and the Plaintiffs moved for summary judgment. The Court concludes that it would be improper to proceed in the state of Maine's absence, given both Article III's case or controversy requirement and Federal Rule of Civil Procedure 19's direction that required parties be joined if feasible.

## I.    PROCEDURAL HISTORY

On February 20, 2013, Louis and Katherine Bourgoin, Donna Stevens, Heidi Brooks, and Katherine Sherrard filed a complaint against Kathleen Sebelius,

Secretary of the United States Department of Health and Human Services (DHHS), on behalf of themselves and all others similarly situated. *Compl.* (ECF No. 1). On February 21, 2013, the Plaintiffs filed a motion for class certification under Federal Rules of Civil Procedure 23(a) and 23(b)(2), stating that the class includes "over 6000 low-income recipients of health care benefits under . . . MaineCare . . . whose eligibility for Medicaid will be reduced or terminated on or after March 1, 2013." *Pls.' Mot. for Class Certification* (ECF No. 13). The same day, the Plaintiffs moved for a temporary restraining order and preliminary injunction. *Pls.' Mot. for TRO and Prelim. Inj.* (ECF No. 14) (*Pls.' Mot.*). The Court denied the motion for temporary restraining order on February 28, 2013. *Order on Mot. for a TRO* (ECF No. 23).

On March 18, 2013, the Secretary filed a copy of the agency record along with a certification. *Certification of Agency Record* (ECF No. 32) (AR). On April 8, 2013, the Secretary filed a motion to dismiss or, in the alternative, for summary judgment, supporting her motion with the declaration of Jennifer Ryan.[1] *Def.'s Mot. to Dismiss or, in the Alternative, for Summ. J.* (ECF No. 34) (*Def.'s Mot.*); *id. Attach. 1*, Decl. of Jennifer Ryan (ECF No. 34-1) (*Ryan Decl.*). On April 22, 2013, the Plaintiffs responded to the Secretary's motion and moved for summary judgment, supporting their motion with a statement of material facts not in dispute. *Pls.' Mem. of Law in Opp'n to Def.'s Mot. to Dismiss or, in the Alternative, for Summ. J.,*

---

[1]      Jennifer Ryan is the Acting Director of the Children and Adults Health Program Group, an office within the Center for Medicaid and CHIP Services, Centers for Medicare & Medicaid Services, the federal agency within the United States Department of Health and Human Services responsible for administering the Medicare and Medicaid programs. *Ryan Decl.* ¶ 1.

*and Pl.'s Mot. for Summ. J.* (ECF No. 37) (*Pls.' Opp'n / Mot.*); *Pls.' Statement of Material Facts Not in Dispute* (ECF No. 38) (PSMF).   On April 29, 2013, the Secretary replied to the Plaintiffs' opposition to her motion and responded to the Plaintiffs' motion.   *Def.'s Reply in Support of Her Mot. to Dismiss or, in the Alternative, for Summ. J. and Opp'n to Pls.' Mot. for Summ. J.* (ECF No. 40) (*Def.'s Reply / Opp'n*); *Def.'s Opposing Statement of Material Facts* (ECF No. 41) (DRPSMF); *id.* at 27 (DSAMF).   On May 6, 2013, the Plaintiffs replied to the Secretary's opposition to their motion for summary judgment.   *Pls.' Reply to Def.'s Opp'n to Pls.' Mot. for Summ. J.* (ECF No. 43) (*Pls.' Reply*); *Pls.' Reply to Def.'s Statement of Additional Facts and to Def.'s Request to Strike Various Paragraphs of Pls.' Statement of Material Facts* (ECF No. 44) (PRDSAMF and *Pls.' Loc. R. 56(e) Resp.*).

## II.   LEGAL BACKGROUND

### A.   General Background on Medicare and Medicaid

In 1965, the United States established Medicare and Medicaid.  *See History*, Centers for Medicare & Medicaid Services, http://www.cms.gov/About-CMS/Agency-Information/History/ (last visited Sept. 30, 2013).  "Medicare is a health insurance program for those who are over age 65 or have certain disabilities." *Massachusetts v. Sebelius*, 638 F.3d 24, 26 (1st Cir. 2011); *see* 42 U.S.C. §§ 1395 to 1395kkk-1 (2012).   Medicaid provides federal funding to states that have established a qualifying plan to assist certain types of needy individuals in obtaining medical care and insurance, including Medicare.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2581 (2012) (*NFIB*); 42 U.S.C. §§ 1396 to 1396w-5 (2012).   In 2010,

Congress enacted the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (ACA), which "aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *NFIB*, 132 S. Ct. at 2580. "The [ACA's] 10 titles stretch over 900 pages and contain hundreds of provisions," *id.*, including amendments to Medicaid.

Federal Medicaid funding is conditioned on a state's compliance with federally-prescribed parameters. *See* 42 U.S.C. §§ 1396b(a), 1396c. Federal law tasks the Secretary of the Department of Health and Human Services with determining whether a state plan is compliant.[2] *See* 42 U.S.C. §§ 1316(a)(1), 1396a(b), 1396c, 1396n(f)(2). Federal law permits the Secretary to waive compliance with certain requirements under certain circumstances. *See, e.g.,* 42 U.S.C. §§ 1315, 1396n(b)-(c), (e)-(f). To qualify for federal funds under Medicaid, a State

> must submit to a federal agency (CMS, a division of the Department of Health and Human Services) a state Medicaid plan that details the nature and scope of the State's Medicaid program. It must also submit any amendments to the plan that it may make from time to time. And it must receive the agency's approval of the plan and any amendments. Before granting approval, the agency reviews the State's plan and amendments to determine whether they comply with the statutory and regulatory requirements governing the Medicaid program.

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204, 1208 (2012). When a state wishes to amend its Medicaid plan, the federal government "will not provide

---

[2]   The Secretary has delegated her authority to approve or disapprove a state plan or plan amendment to the Administrator and the Regional Administrator. 42 C.F.R. § 430.15(b)-(c); *see* 42 U.S.C. § 1302.

federal funds for any state plan amendment until the agency approves the amendment." *Douglas*, 132 S. Ct. at 1208.

The Medicaid Act prescribes mandatory coverage of certain categories of individuals and optional coverage of others.  A state plan "must—provide—for making medical assistance available . . . to—all individuals—" in the seven categories listed under 42 U.S.C. § 1396a(a)(10)(A)(i).[3]   *See* 42 U.S.C. § 1396a(a)(10)(A)(i)(I)-(VII).   Federal law further provides that a state plan "must—provide—for making medical assistance available . . . to—at the option of the State, . . . any group or groups of individuals described in section 1905(a) [42 U.S.C. § 1396d(a)] (or, in the case of individuals described in section 1905(a)(i) [42 U.S.C. § 1396d(a)(i)], to any reasonable categories of such individuals) who are not individuals described in clause (i) of this subparagraph but—" are described in one of twenty-two categories that follow.  *See* 42 U.S.C. § 1396a(a)(10)(A)(ii)(I)-(XXII).

In addition, and relevant here, federal law provides that a state plan must provide certain Medicaid benefits "for qualified medicare beneficiares (QMBs) described in section 1905(p)(1) [42 U.S.C. § 1396d(p)(1)]."   42 U.S.C. § 1396a(a)(10)(E)(i).   To qualify as a QMB, one must: (1) be entitled to certain Medicare benefits, (2) have income that does not exceed the federal poverty line, and (3) have resources that do not exceed a specified level.  42 U.S.C. § 1396d(p). Federal law likewise mandates certain Medicaid benefits "for individuals who would be [QMBs] but for the fact that their income exceeds" the federal poverty line but is

---

[3]      The ACA adds two additional categories on January 1, 2014, although coverage of one of these additional categories is optional following the Supreme Court's decision in *NFIB*.  42 U.S.C. § 1396a(a)(10)(A)(i)(VIII)-(IX); *NFIB*, 132 S. Ct. at 2601-09.

less than 120 percent of the poverty line—these individuals are known as "Specified Low-Income Medicare Beneficiaries" (SLMBs)—and "for individuals who would be [QMBs] but for the fact that their income . . . is at least 120 percent, but less than 135 percent, of the official poverty line . . . "—these individuals are known as "Qualified Individuals" (QIs), and are limited in number based on annual federal outlays.  42 U.S.C. §§ 1396a(a)(10)(E)(iii)-(iv), 1396u-3.

In general, a state plan must "include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan," 42 U.S.C. § 1396a(a)(17), and must generally "apply the financial methodologies and requirements of the cash assistance program that is most closely categorically related to the individual's status."[4]  42 C.F.R. § 435.601(b).  In determining income and resource eligibility for QMBs, SLMBs, and QIs, however, states may employ a "less restrictive" methodology.  42 U.S.C. § 1396a(r)(2)(A); 42 C.F.R. § 435.601(d)(iii).  Before adopting the plan amendment at issue in this case, Maine's less restrictive methodology "disregarded" income equal to 50% of the federal poverty level.  *Pls.' Mot.* Attach. 2 *State Plan Under Title XIX of the Social Security Act* (ECF No. 14).

### B.    Maintenance of Effort

The ACA added a "maintenance of effort" (MOE) requirement to the Medicaid statute.  *See* Pub. L. No. 111-148, § 2001(b), 124 Stat. 119, 275-76 (codified at 42

---

[4]    Under the ACA, beginning January 1, 2014, "income" will generally be defined as modified adjusted gross income under the Internal Revenue Code, except for determining the eligibility of certain individuals, including QMBs, SLMBs, and QIs.  Pub. L. No. 111-148, § 2002, 124 Stat. 119, 279-82 (codified at 42 U.S.C. § 1396a(e)(14)); 42 U.S.C. § 1396(e)(14)(D)(V).

U.S.C. §§ 1396a(a)(74), 1396a(gg)).  As amended by the ACA, the Medicaid Act

provides that a state Medicaid plan "must—provide for maintenance of effort under

the State plan or under any waiver of the plan in accordance with subsection (gg)."

42 U.S.C. § 1396a(a)(74).  Subsection (gg) reads:

(gg) Maintenance of effort.

(1) General requirement to maintain eligibility standards until
state exchange is fully operational.  Subject to the succeeding
paragraphs of this subsection, during the period that begins on the
date of enactment of the Patient Protection and Affordable Care Act
and ends on the date on which the Secretary determines that an
Exchange established by the State under section 1311 of the Patient
Protection and Affordable Care Act is fully operational, as a condition
for receiving any Federal payments under section 1903(a) [42 U.S.C. §
1396b(a)] for calendar quarters occurring during such period, a State
shall not have in effect eligibility standards, methodologies, or
procedures under the State plan under this title or under any waiver
of such plan that is in effect during that period, that are more
restrictive than the eligibility standards, methodologies, or
procedures, respectively, under the plan or waiver that are in effect
on the of enactment of the Patient Protection and Affordable Care
Act.

. . .

(3) Nonapplication.  During the period that begins on January 1,
2011, and ends on December 31, 2013, the requirement under
paragraph (1) shall not apply to a State with respect to nonpregnant,
nondisabled adults who are eligible for medical assistance under the
State plan or under a waiver of the plan at the option of the State and
whose income exceeds 133 percent of the poverty line (as defined in
section 2110(c)(5)) applicable to a family of the size involved if, on or
after December 31, 2010, the State certifies to the Secretary that,
with respect to the State fiscal year during which the certification is
made, the State has a budget deficit, or with respect to the succeeding
State fiscal year, the State is projected to have a budget deficit.  Upon
submission of such a certification to the Secretary, the requirement
under paragraph (1) shall not apply to the State with respect to any
remaining portion of the period described in the proceeding sentence.

(4) Determination of compliance.
    (A) States shall apply modified adjusted gross income.  A State's determination of income in accordance with subsection (e)(14) shall not be considered to be eligibility standards, methodologies, or procedures that are more restrictive than the standards, methodologies, or procedures in effect under the State plan or under a waiver of the plan on the date of enactment of the Patient Protection and Affordable Care Act for purposes of determining compliance with the requirements of paragraph (1), (2), or (3).

    . . .

42 U.S.C. § 1396a(gg).

### C.  *NFIB v. Sebelius*

The Medicaid Act authorizes the Secretary to withhold all federal payments if a state fails to comply with any federal requirement.  42 U.S.C. § 1396c.  The Supreme Court recently held, however, that the Constitution limits the reach of this authority.  *NFIB*, 132 S. Ct. at 2601-2609.  The *NFIB* Court noted that Medicaid spending accounts for over 20 percent of the average State's total budget, with federal funds covering 50 to 83 percent of those costs.[5]  *Id.* at 2604-05.  Given the financial burden that would result if the Secretary were to withhold all federal Medicaid funding from a state, the Supreme Court called 42 U.S.C. § 1396c a "gun to the head" and prohibited the Secretary from using it to coerce a state into complying with section 2001(a) of the ACA, which amended the Medicaid Act to require states to

---

[5]    "Federal funds received through the Medicaid program have become a substantial part of state budgets, now constituting over 10 percent of most States' total revenue."  AR *Attach. 2* at 103 (ECF No. 32-2).  Maine relies even more heavily on federal Medicaid funding than the average state; "[i]n Maine, for the state's  fiscal year 2013 (July 1, 212 to June 30, 2013) the Medicaid program, which is known as MaineCare, constitute[d] 33.7 percent of the total state budget, and the federal Medicaid funds constitute[d] 21.97 percent of the state's budget."  *Id.*

expand their Medicaid programs by 2014 to cover all individuals under the age of 65 with incomes below 133 percent of the federal poverty line. *Id.* at 2604-2608; Pub. L. No. 111-148, § 2001(a), 124 Stat. 119, 271-75 (codified at 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII). The Supreme Court did not mention the ACA's "maintenance of effort" requirement, which is included in the same section that contains the Medicaid expansion that the Court ruled was effectively optional. Pub. L. No. 111-148, § 2001(b), 124 Stat. 119, 275-76.

### D.   Maine State Law

In 2012, Maine passed an appropriations bill that included the following provision:

> The Department of Health and Human Services shall prepare and submit a Medicaid state plan amendment to the federal Centers for Medicare and Medicaid Services that, effective October 1, 2012, effectively reduces income eligibility levels for the Medicare savings program as follows: for the Qualified Medicare Beneficiary program, to income not more than 140% of the federal poverty level; for the Specified Low-Income Medicare Beneficiary program, to income more than 140% but not more than 160% of the federal poverty level; and for the Qualified Individuals program, to income more than 160% but not more than 175% of the federal poverty level.

2011 Me. Laws ch. 657 § HH-2. The bill provides that section HH-2 takes effect only if:

> 1. The Commissioner of Health and Human Services receives written approval of the application for a waiver of the maintenance of effort requirements of the federal Patient Protection and Affordable Care Act for the changes in section 2 from the federal Centers for Medicare and Medicaid Services or the commissioner receives written notification from the Centers for Medicare and Medicaid Services that such a waiver is not necessary; and

> 2. The Commissioner of Health and Human Services notifies the Secretary of State, the Secretary of the Senate, the Clerk of the House

of Representatives and the Revisor of Statutes that written approval of the application for a waiver or written notification that such a waiver is not necessary has been received.

*Id.* § HH-3.[6]

## III.   STATEMENT OF FACTS

### A.   Constructing the Record

Given that the parties agree that this case centers on a nearly pure question of law, presenting the Court with an evidentiary record proved surprisingly contentious.   Before delving into the facts, the Court resolves a few disputes regarding the record.

First, the Secretary maintains that it is appropriate for the Court to decide her motion based on the administrative record and the declaration of a government official.  *Def.'s Mot.* at 9-10; *Def.'s Reply/Opp'n* at 2 n.4.  The Plaintiffs counter that the Secretary's failure to file a statement of material facts in accordance with Local Rule 56(b) makes her motion improper to the extent it seeks summary judgment. *Pl.'s Opp'n/Mot.* at 2.   Nothing turns on this skirmish.   The Secretary cites *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993), as supporting the proposition that "[i]n an APA action for judicial review, a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, for summary judgment under Rule 56 based on the administrative record is an appropriate mechanism for resolving the action."  *Def.'s Mot.* at 9.  The *Shalala* Court, however, affirmed a dismissal under Rule 12(b)(6) and wrote that

---

[6]     Section HH-1, however, amends the uppermost income eligibility level for "the basic program and the supplemental program" from 185% to 175% of the applicable federal poverty guideline, and is not contingent on approval from CMS.  2011 Me. Laws ch. 657 § HH-1.

10

"[w]hen a district court is reviewing agency action—sitting as an appellate tribunal—the legal questions raised by a [Rule] 12(b)(6) motion and a motion for summary judgment are the same" and the court may "examine matters of public record in ruling on a Rule 12(b)(6) motion." *Shalala*, 988 F.2d at 1222. The Secretary does not explain why she has moved in the alternative for summary judgment if her position is that an APA challenge may be resolved on a motion to dismiss. The Court treats the Secretary's motion as a motion to dismiss only and ignores the summary judgment request as irrelevant and unsupported by a statement of material facts. In ruling on the Secretary's motion to dismiss, the Court is required to accept as true the Plaintiffs' well-pleaded factual allegations and to draw all reasonable inferences in favor of the Plaintiffs but is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *See San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá*, 687 F.3d 465, 471 (1st Cir. 2012) (en banc) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In doing so, the Court may also "examine matters of public record in ruling on a Rule 12(b)(6) motion." *Shalala*, 988 F.2d at 1222.

Turning to the Plaintiffs' motion for summary judgment, of the forty-two statements of material fact proposed by the Plaintiffs, the Secretary admitted just eleven. *See* DRPSMF ¶¶ 1-42. Two categories of statements bear general discussion. In the first category are descriptions of the relevant law. The Secretary interposed qualified responses to these statements, requested that they be stricken, and denied them to the extent they are inconsistent with the relevant law (without

specifying any inconsistencies).   As an example, the Plaintiffs proposed the statement:

> Title XIX of the Social Security Act establishes the Medicaid Act, which provides conditional federal funding to states that choose to participate in the Medicaid program.  See 42 U.S.C. § 1396-1396w-5.

PSMF ¶ 1.  The Secretary responded:

> Qualified.   This statement should be stricken because it is a characterization of the Medicaid statute and thus a legal conclusion, not a fact, and is not supported by a citation to record material as required by Local Rule 56(f).  *See Rockwell Burr Sign & Design, Inc. v. Gulf Ins. Co.* No. 02-222, 2003 WL 22063550, *1 (D. Me. Sept. 5, 2003). The statement is denied to the extent it is inconsistent with the Medicaid statute.

DRPSMF ¶ 1.   In turn, the Plaintiffs replied that "it is clear that accurate restatements of the law are admissible."  *Pls.' Loc. R. 56(e) Reply* ¶¶ 1-8 (citing *United States v. Cap Quality Care, Inc.*, Docket No. 05-163-P-H, 2006 U.S. Dist. LEXIS 88830, at *22 n.4 (D. Me. Dec. 7, 2006).

On this point, the Plaintiffs are wrong.  Local Rule 56 contemplates the filing of "a separate, short, and concise statement of material facts . . . as to which the moving party contends there is no genuine issue of material fact to be tried."  D. ME. LOC. R. 56(b).  Statements of law are not statements of fact.[7]   Legal argument is more properly included in a memorandum of law than in a statement of material facts, and the Court has considered the statements of law included in the Plaintiffs' statement of material facts only as argument.

---

[7]      In *Cap Quality*, the Magistrate Judge allowed the citation of a regulation from the Code of Federal Regulations to stand as a statement of fact.   *Cap Quality*, 2006 U.S. Dist. LEXIS 88830, *22 n.4.  Although in an unusual case the quotation of a rule might qualify as a statement of fact, the better practice is to place statutory quotations in a legal memorandum.

The second category of statements objected to by the Secretary concern the named Plaintiffs.  To these, the Secretary responds:

> Qualified.  The statement should be stricken because it is offered in support of the Plaintiffs' motion for summary judgment and the briefing schedule entered by the Court does not contemplate briefing on Plaintiffs' motion for preliminary injunction at this time, and such briefing is beyond the scope of the cross-dispositive motions that the briefing schedule does contemplate.  *See* Dkt. Entry of Mar. 21, 2013. Further, the Secretary is without information or knowledge sufficient to admit or deny the statement.

DRPSMF ¶¶ 29-40.  Because the Court concludes that the case cannot proceed without the state of Maine, it defers a ruling on the merits of the dispositive motions, there is no current need to consider facts regarding the named Plaintiffs and consequently no need to resolve this dispute.

### B.    The Facts

#### 1.    Initial Discussions

On April 15, 2011, Maine's Governor wrote a letter to Secretary Sebelius requesting a waiver from the APA's MOE requirements, noting that Maine's Medicaid program is extremely generous and exceeds the minimum eligibility guidelines set by federal law, and that Maine faced an $800 million deficit for fiscal years 2012 and 2013.  AR Attach. 2 at 136-37.  The same day, the Deputy Commissioner for Finance of MDHHS submitted a letter to Secretary Sebelius certifying that Maine projected a budget deficit for fiscal years 2012-2013 and 2014, representing the period 07/01/2011 – 12/31/2013.  AR Attach. 2 at 138.  CMS Associate Regional Administrator Richard R. McGreal emailed Commissioner Mayhew on May 24, 2011:

In your letter to the Secretary dated April 15, 2011, and in subsequent followup discussions with State staff, the State of Maine asked whether the maintenance of effort (MOE) provisions in section 1902(gg) of the Social Security Act, as amended by the Affordable Care Act, were applicable with respect to the Medicare "buy-in" groups (such as the "QMB", "SLMB", and "QI" groups). The MOE provisions in the Affordable Care Act would be applicable to such groups.

You have also inquired whether the "non-application" of MOE provisions in section 1902(gg)(3) of the Act could apply to such groups. Since the basis for individuals' eligibility under the Medicare buy-in groups includes disability, the nonapplication of MOE provisions would be precluded from being applied to such groups.

AR Attach. 2 at 135; PSMF ¶ 20.

On December 20, 2011, Commissioner H. Sawin Millett, Jr., submitted a letter to Secretary Sebelius certifying a projected budget deficit for state fiscal year 2013 representing the period 07/01/2012 – 06/30/2013. AR Attach. 2 at 125; *Compl.* ¶ 39.

## 2. SPA # 12-010

On August 1, 2012, Mary C. Mayhew, Commissioner of Maine's Department of Health and Human Services, wrote Richard R. McGreal, CMS Associate Regional Administrator, requesting approval of proposed Medicaid State Plan Amendment 12-010; Governor Paul LePage wrote Secretary Sebelius the same day informing her of Maine's request for expedited approval. AR Attach. 2 at 98-111; *Compl.* ¶ 40; PSMF ¶ 22; DRPSMF ¶ 22. Proposed SPA # 12-010 contained three components: (1) a reduction in the maximum income eligibility level from 200% to 100% of the federal poverty line for parents and other caretaker relatives eligible under Sections 1902(a)(A)(10)(ii)(I) and 1905(a)(ii) of the Social Security Act; (2) a decrease in the coverage of 19- and 20-year-old individuals; and (3) a decrease equal to 10% of the

14

federal poverty line in the income eligibility levels for QMBs, SLMBs, and QIs. *Id.* at 101-02. Maine argued that its approval request should be granted for a number of reasons, including that the MOE requirement cannot be enforced following the Supreme Court's decision in *NFIB*. *Id.* at 98-99, 103-11. Maine's Governor argued that the MOE requirement "is part and parcel of the Medicaid expansion that was struck down" in *NFIB*; Maine's DHHS Commissioner contended that the MOE requirement "is an even more clear case of an unconstitutional condition than [that] dealt with in *NFIB*." *Id.* at 99, 108-10.

On August 9, 2012, Sara Gagné-Holmes, Esq., and Jack Comart, Esq.,[8] of Maine Equal Justice Partners, wrote a letter to Secretary Sebelius in opposition to proposed SPA # 12-010. AR Attach. 2 at 81-84. Attorneys Gagné-Holmes and Comart disagreed with the State's interpretation of *NFIB* and of the ACA's MOE requirement. *Id.*

On August 17, 2012, the Commissioner of Maine DHHS posted notice of public rulemaking (Rule # 261P) to implement the reductions in eligibility for the Medicare buy-in program.[9] PSMF ¶ 41; DRPSMF ¶ 41. Comments on the proposed rule were due August 17, 2012. *Id.* The notice of proposed rulemaking stated:

> Under state law (P.L. 2011 ch. 657) and federal Medicaid law, the changes set forth in these proposed rules cannot be implemented until the Department has received federal approval. The Department has sought federal approval to amend its State plan. If the Department does not receive federal approval prior to October 1, 2012, the

---

[8]     Attorney Comart represents the Plaintiffs in this case.

[9]     The Court considers this fact for purposes of the Secretary's motion to dismiss because it is a matter of public record. *Shalala*, 988 F.2d at 1222.

> Department will abandon this rulemaking, and the Commissioner will
> not adopt these rules.

*Id.* On August 31, 2012, the Secretary sent a letter to the Maine DHHS advising
that the Secretary has "90 days for review of the state plan amendment." PSMF ¶
24; DRPSMF ¶ 24.

On September 4, 2012, Maine commenced suit in the United States Court of
Appeals for the First Circuit against the Secretary seeking review of the Secretary's
failure to act upon Maine's State Plan Amendment request within the time limits
that the State of Maine had demanded. *Id.* On September 13, 2012, the First
Circuit summarily denied the State's petition, stating that the "facts do not warrant
the mandamus-like relief of ordering Respondents to consider or approve the SPA
by October 1, 2012." *Id.*; *Mayhew v. Sebelius*, No. 12-2059, 2012 U.S. App. LEXIS
21083 (1st Cir. 2012). On October 4, 2012, Governor LePage sent a letter to
Secretary Sebelius asking her to approve Maine's State Plan Amendment without
delay: "I write to firmly request that you and your staff act on Maine's state plan
amendment in a timely manner. Your failure to act necessitated Maine's filing with
the courts . . . ." PSMF ¶ 25; DRPSMF ¶ 25. On November 1, 2012, Commissioner
Mayhew's office forwarded to CMS a press release from Governor LePage accusing
the federal government of engaging in "political games" by not promptly approving
Maine's State Plan Amendment, stating that Governor LePage told Secretary
Sebelius that "Maine needs and deserves answers now," and quoting the Governor
as having said that "[d]elaying tactics, such as the immaterial questions CMS sent
to Commissioner Mayhew, will not solve the problem." PSMF ¶ 26; DRPSMF ¶ 26.

### 3.    Revised SPA # 12-010 and SPA # 12-010A

Following discussions between state and federal officials, Associate Regional Administrator McGreal issued a formal Request for Additional Information (RAI) on October 26, 2012.   AR Attach. 2 at 68-69.   Governor LePage sent a letter to Secretary Sebelius on November 1, 2012, expressing frustration with the delay and reiterating Maine's view "that the Supreme Court freed Maine from the 'economic dragooning' of the Affordable Care Act."   AR Attach. 2 at 61-62.   On November 5, 2012, Commissioner Mayhew responded to the RAI.   AR Attach. 1 at 52-55.   She stated that "Maine would like to split the current SPA in order to have the changes to non-pregnant, non-disabled adult beneficiaries for families with incomes above 133 percent of the FPL approved immediately, as the law contemplates."   *Id.* at 52.

On November 14, 2012, Commissioner Mayhew sent Associate Regional Administrator McGreal revised proposed SPA # 12-010A, which contained only the proposed amendments to the income eligibility levels for QMBs, SLMBs, and QIs. *Id.* at 18.   Associate Regional Administrator McGreal approved SPA # 12-010A on January 7, 2013.   *Id.* at 15-17; *Compl.* ¶ 41.   The approved amendments took effect March 1, 2013.   *Compl.* ¶ 42.   The Secretary's approval of SPA # 12-010A had the effect of reducing or terminating the Plaintiffs' Medicaid eligibility.[10]   PSMF ¶ 27; DRPSMF ¶ 27.   SPA # 12-010A, effective March 1, 2013, changed Maine's eligibility methodology, making it more restrictive than the methodology that existed on March 23, 2010, by reducing the allowable disregards:

---

[10]    The Secretary interposed a qualified response, stating that she does not know whether the Plaintiffs are members of the covered groups.   The Court deems the statement admitted for purposes of summary judgment.

    a. for QMBs from the difference between 150% of FPL and 100% of FPL to the difference between 140% and 100% of FPL;

    b. for SLMBs from the difference between 170% of FPL and 120% of FPL to the difference between 160% and 120% of FPL.

    c. for SLMBs from the difference between 185% of FPL and 135% of FPL to the difference between 175% and 135% of FPL.

PSMF ¶ 28; DRPSMF ¶ 28.

Also on January 7, 2013, Acting Administrator Marilyn Tavenner refused to approve SPA # 12-010, which contained Maine's other proposed amendments. *Id.* at 10-13. Acting Administrator Tavenner stated that these proposed amendments would violate the ACA's MOE requirement and that CMS disagreed with Maine's claim that *NFIB* affected the MOE requirement. *Id.*

### 4.   The State of Maine's Absence

Plaintiffs' counsel contacted counsel for the Maine Department of Health and Human Services on several occasions to alert them to this pending lawsuit and to inquire whether they had any interest in intervening in the case.[11]   PSMF ¶ 42; DRPSMF ¶ 42. While largely unresponsive to these various inquiries, they did inform Plaintiffs' counsel that they had communicated their views to AUSA John Osborn. *Id.*

## IV.   THE PARTIES' POSITIONS

### A.   The Secretary's Motion

---

[11]     The Secretary interposed a qualified response, stating that she "is without information sufficient to admit or deny the statement." DRPSMF ¶ 42. The Court deems the statement admitted for purposes of summary judgment.

As background, the Secretary describes the provisions of the Medicaid statute and the Affordable Care Act that she contends are relevant to this case. *Def.'s Mot.* at 2-6.[12]  She also describes the procedural background of the case. *Id.* at 6-13.  She discusses the legal standards that govern judicial review under the Administrative Procedure Act (APA) of her decision to approve a state plan amendment. *Id.* at 13-15.  She argues that judicial review should be based on the administrative record and that courts may also consider an agency official's affidavit or declaration. *Id.* at 13-14.  She maintains that her decision to approve SPA # 12-010A is "entitled to *Chevron* deference" because it involved an exercise of the interpretive authority given her by Congress, and that the approval should thus be upheld so long as it is reasonable. *Id.* at 14.  She notes the "cardinal rule" that "a statute is to be read as a whole." *Id.* at 15 (quoting *Simmons v. Galvin*, 575 F.3d 24, 35 (1st Cir. 2009)).

The Secretary argues that because the Medicaid statute "structures Medicaid eligibility according to membership in specified eligibility groups," the reference to "nonpregnant, nondisabled adults" refers to "groups not eligible for Medicaid on the basis of pregnancy, disability or status as a child." *Id.* at 15.  She says that the Medicaid statute "authorizes State plans to cover various groups of individuals and establishes requirements to be applied on the basis of group eligibility." *Id.* at 15.  The Medicaid statute does not, in her view, "authorize coverage of subgroups, with a single limited exception for 'reasonable categories' of children." *Id.* at 16.  Accordingly, the Medicaid statute authorizes a state plan like Maine's to cover the entire population of QMBs, SLMBs or QIs "but not to cover subgroups of those

---

[12]     The internal pagination differs from the ECF pagination; the Court uses the ECF pagination.

populations," such as "only those QMBs, SLMBs and QIs who are entitled to or eligible for Medicare Part A or Part B based on a finding of permanent disability." *Id*. She contends that it would be "inconsistent with the purpose of the MOE exception to interpret it as precluding states from amending their eligibility 'standards, methodologies or procedures' for any group that could have a disabled or pregnant person in it," and argues that such an interpretation "would render the exception meaningless." *Id*. She notes that states might not even have this information. *Id*. at 16-17. She says that "CMS's interpretation of the Medicaid statute as allowing state plans to cover the entire population of Medicare buy-in groups but not permitting coverage of subgroups of that population is longstanding." *Id*. at 17. She observes that this interpretation is consistent with CMS's direction to states to ensure that applying more restrictive eligibility provisions "would not result in the loss of eligibility for individuals who are eligible based on pregnancy or disability." *Id*. at 17-18. She explains that the Plaintiffs are "not part of a group deemed eligible for Medicaid based on disability, pregnancy or status as a child, but rather were eligible for the Medicare buy-in program on the basis of their having been entitled to or eligible for Medicare and having income below a certain level," and that they are therefore "nonpregnant, nondisabled adults" within the meaning of the MOE exception. *Id*. at 18. She denies that a contrary interpretation expressed in an April 2011 email should be construed as an "inconsistent interpretation of the Secretary," explaining that the email was "part of

an open dialogue" and "did not reflect a final decision of the Secretary." *Id.* at 18 n.15.

The Secretary argues that "income" under 42 U.S.C. §1396a(gg)(3) refers to "income calculated without State income disregards." *Def.'s Mot.* at 19.   She contends that this interpretation is supported by the statute's plain language and "is consistent with the statutory scheme of the ACA with respect to Medicaid." *Id.* She explains that under the ACA, persons with incomes at or below 133 percent of the FPL were to be eligible for Medicaid starting January 1, 2014; the MOE exception was designed to prevent states from withholding Medicaid from persons with incomes at or below 133 percent of the FPL prior to January 1, 2014. *Id.* at 19-20.   She observes that the ACA "provides for states to determine income for eligibility and other purposes under State plans according to the modified adjusted gross income methodology, which does not factor in the block income disregards." *Id.* at 19.   She notes that "[t]he Medicaid expansion provision and the MOE nonapplication provision are in adjacent subsections of Section 2001 of the ACA," evidencing Congress's intent to provide continuity of Medicaid coverage. *Id.* at 20.

The Secretary also notes that 42 U.S.C. § 1396a(gg)(4) "specifies that  for purposes of complying with the MOE requirement a state can determine income according to modified adjusted gross income." *Id.* at 21.   She maintains that if the Court finds the reference to "income" to be ambiguous, the Secretary's interpretation is reasonable and should be upheld under *Chevron*. *Id.* at 21.   She compares her interpretation to that put forth by the Plaintiffs, and claims that the

Plaintiffs' interpretation would lead to results that are inconsistent with the purpose of the MOE exception, which is to provide fiscal relief. *Id.* at 21-22. She also notes that the Plaintiffs' interpretation would lead to widely varying applications of the MOE requirement from state to state. *Id.* at 22. She contends, moreover, that the Plaintiffs' interpretation is based on circular reasoning. *Id.* at 22-23.

Turning to whether the state of Maine is a necessary party, an issue the Court directed the parties to address, the Secretary argues that it is "significant that Maine has not elected to intervene or otherwise participate in this action" despite knowing of it. *Id.* at 23. She recites Federal Rule of Civil Procedure 19(a)(1) and states that "Maine's presence would not be necessary to effect the relief that the Complaint seeks: vacatur of the Secretary's approval of SPA # 12-010A." *Id.* at 24. She notes, however, that if the Court ruled for the Plaintiffs and the Secretary vacated her approval, Maine might not reinstate the dropped populations, in which case her only enforcement authority would be to bring a compliance action, which is discretionary. *Id.* at 24. She notes that if she chose to do so, the compliance proceedings would be lengthy and only prospective relief in the form of a funding cut-off would be available. *Id.* She concludes that Maine is not a necessary party under Rule 19 and states that Maine's absence "as a practical matter does not leave its interests concerning the SPA unprotected." *Id.*

## B.     The Plaintiffs' Opposition/Motion

The Plaintiffs state the summary judgment standard and note that the Secretary's motion for summary judgment is not properly before the Court. *Pls.' Opp'n/Mot.* at 2. They describe the legal and factual background. *Id.* at 3-8. They argue that under "step one" of the *Chevron* doctrine, "if the intent of congress is clear, that meaning controls and no further inquiry is required." *Id.* at 8. They contend that the Secretary's approval of SPA # 12-010(a) violates the plain language of the MOE exception. *Id.* at 9. Regarding the phrase "nondisabled adults" in 42 U.S.C. §1396a(gg)(3), the Plaintiffs note that the phrase is not defined by or used elsewhere in the statute, and should thus be given its ordinary meaning. *Id.* at 9-10. They maintain that "the MOE exception applies to adults who are not disabled." *Id.* at 10. They argue that if Congress had meant for the MOE exception to apply to groups rather than any individuals, it would have made this clear as it did elsewhere in the Medicaid statute. *Id.* at 11. They note that "exceptions should be read narrowly" and urge the application of that canon here. *Id.* at 11-12.

The Plaintiffs argue that because the statutory language is clear, the Secretary's interpretation is entitled to no deference. *Id.* at 12. They also dispute the accuracy of her contention that eligibility standards targeting subgroups are not permitted under the Medicaid statute, and claim that CMS has acknowledged this. *Id.* (citing 42 C.F.R. §§ 435.601(d)(1)(iii)). The Plaintiffs argue that the Secretary's "newly announced administrative convenience argument" deserves no deference and lacks merit. *Id.* at 13-14.

Turning to the proper interpretation of "income," the Plaintiffs again argue that the statute's meaning is clear. *Id.* at 14. They say that subsections (gg)(1) and (gg)(3) must be read together and that doing so supports their interpretation of income as incorporating state-based disregards. *Id.* at 14-15. The Plaintiffs claim that the Secretary's interpretation "has no basis in the statute." *Id.* at 15. They deny that subsection (gg)(4) supports the Secretary's interpretation. *Id.*

The Plaintiffs contend that the Secretary's SPA approval is more analogous to a Medicaid waiver approval than to formal adjudication or notice-and-comment rulemaking, and does not warrant *Chevron* deference. *Id.* at 16. They note that the Secretary acted under pressure from the state of Maine, that the amendment was approved in a simple and conclusory one-page letter without analysis or explanation, and that the approval letter was written by an official that had previously informed the State that the MOE exception did not cover the proposed amendment. *Id.* at 17. Given the "lack of formality and detailed review," the Plaintiffs maintain that the Secretary's interpretation deserves no deference. *Id.*

The Plaintiffs say that the Secretary's interpretation of "income" in subsection (gg)(3) would render (gg)(1) "surplusage" and "makes little sense." *Id.* at 18. They give eight reasons why income should not be interpreted to mean "modified adjusted gross income." *Id.* at 19. They say that the Secretary's argument is a "post hoc rationalization" due no deference and that accepting her position "would drive a truck through a narrow exception." *Id.* at 20. They warn

24

that the Secretary's position would "render[ ] obsolete all of the various federal and state income disregards currently in use." *Id.*

The Plaintiffs argue that injunctive relief is warranted because they are suffering irreparable harm, and because the public interest and balance of equities favor it. *Id.* at 21-26. They say that the Maine DHHS is not a necessary party under Rule 19(a) because they can obtain "complete relief"—which, in their view, means relief between the extant parties rather than in an overall sense—from the Secretary. *Id.* at 26-27. They reiterate that "Rule 19(a)(1)(A) applies to current parties only." *Id.* at 27. They are "confident that DHHS will abide by this Court's ruling" and contend that the possibility that it would not does not make it a necessary party. *Id.* They note that Maine law conditioned the reduction in coverage on the Secretary's approval and say that "it is well settled that when a state operates a Medicaid program, it must obey all federal statutory and regulatory requirements that govern such programs." *Id.* at 27-28. They add that joinder is also not required under Rule 19(a)(1)(B), noting that the State knew of the case yet has not attempted to join, and asserting that there is "identity of interests" between the Secretary and Maine DHHS. *Id.* at 28-29. They conclude that the Court would not be issuing a "hollow judgment" without Maine DHHS and state that there is "no reason or ground to speculate" that the State agency "will not adhere to its earlier statements and the commands of federal and state law." *Id.* at 29.

### C.   The Secretary's Reply/Opposition

The Secretary emphasizes that the "Plaintiffs' interpretation of the MOE exception as pertaining to individuals rather than groups conflicts with and contravenes the statutory design of the Medicaid program which operates based on group eligibility." *Def.'s Reply/Opp'n* at 5.[13]   She notes that the Plaintiffs' interpretation would also "conflict with Congress' intent to offer states facing budget crises an opportunity for meaningful fiscal relief." *Id.*   She says that "determination of income is distinct from application of income eligibility standards, methodologies or procedures." *Id.*

She reiterates that her approval of the SPA deserves deference. *Id.* at 6-7. She notes that the Ninth Circuit and the D.C. Circuit have held that the Secretary's decision to approve a state plan amendment is "an exercise of her specific interpretive authority expressly delegated by Congress under the Medicaid statute." *Id.* at 7 (citing *Managed Pharmacy Care v. Sebelius*, 705 F.3d 934, 946 (9th Cir. 2012), and *Pharm. Research & Mfrs. Of Am. v. Thompson*, 362 F.3d 817, 821-22 (D.C. Cir. 2004)).   She disputes the Plaintiffs' analysis of *Bryson v. Shumway*, 308 F.3d 79 (1st Cir. 2002), which she notes was decided before more pertinent cases from other circuits, and labels the First Circuit's discussion of *Chevron* "obiter dictum." *Def.'s Reply/Opp'n* at 7-8.

She returns to her interpretation of the phrase "nonpregnant, nondisabled adults," and argues that "Plaintiffs' focus on the plain meaning of 'Non,'" misses the point. *Id.* at 8-9.   She says that the use of the word "groups" elsewhere in the Medicaid statute does not support the Plaintiffs' position because the statute also

---

[13]     The internal pagination differs from the ECF pagination; the Court uses the ECF pagination.

refers to "individuals" elsewhere. *Id.* at 9. She argues that the Plaintiffs' characterization of 42 U.S.C. § 1396a(r) as permitting "subgroups" is inaccurate. *Id.* She emphasizes that "the Medicaid program is based on groups, not sub-groups." *Id.* at 9-10. She denies that her interpretation is based on "mere administrative convenience," insisting that it is instead based on statutory requirements and Congressional intent. *Id.* at 10. The Secretary argues that Acting Director Ryan's declaration "is an appropriate explanation of the Secretary's decision to approve Maine's SPA" rather than "a post-hoc litigation affidavit." *Id.* at 10-11.

The Secretary contends that her interpretation of "income" is supported by the plain language of subsections (gg)(3) and (gg)(4). *Id.* at 12-13. She says that an "income 'disregard'" is "not a determination that the individual does not have the income in question, but instead is a methodology under which that income is not counted for eligibility purposes." *Id.* at 13. She reiterates that her interpretation is based on the need to interpret the MOE provision in light of the ACA's Medicaid expansion, which is based on modified adjusted gross income. *Id.* at 14-15. She responds to the Plaintiffs' argument that this is a post-hoc rationalization by saying that the argument "elaborates on but does not alter the interpretation underlying the Secretary's decision." *Id.* at 15. She notes that the Plaintiffs did not refute her point that, under their interpretation, the MOE exception would apply only to QIs with incomes between 133 and 135 percent of the FPL—"an unreasonable result" inconsistent with Congressional intent. *Id.* at 15-16. She also repeats her

argument that the Plaintiffs' interpretation would lead to "widely varying applications " of the MOE exception. *Id.* at 16.

The Secretary argues that the Plaintiffs' arguments for injunctive relief are premature and asks for discovery in the event that the Court denies the dispositive motions. *Id.* She does not add to her discussion regarding the state of Maine's joinder except to deny that her position is that Maine is not a necessary party. *Id.* at 17.

## V.   DISCUSSION

An aggrieved Medicaid beneficiary typically challenges an arguably unlawful rule change by suing the state official charged with implementing the rule change instead of or in addition to the federal official that authorized the change. *See, e.g., Willey v. Petit*, Civil No. 85-0295-B, 1986 U.S. Dist. LEXIS 29459 (D. Me. Feb. 10, 1986) (action to enjoin the Commissioner of the Maine Department of Human Services from implementing, under direction from the Secretary of the U.S. Department of Health and Human Services, a rule change regarding the exclusion of resources for purposes of Medicaid eligibility); *Winslow v. Commissioner, Me. Dep't of Human Servs.*, 795 F. Supp. 47 (D. Me. 1992) (class action challenging the reasonableness of the income eligibility levels set by the Maine Department of Human Services for the Maine Medicaid program). In this case, however, the Plaintiffs have not sued the State or any of the state officials that proposed and implemented SPA # 12-010A. Their Complaint focuses on the Secretary's approval of SPA # 12-010A rather than on SPA # 12-010A itself. *Compl.* Given Maine's

obvious interest in the case, the Court asked the parties to address whether Maine
is a necessary party.

> Under Federal Rule of Civil Procedure 19(a)(1),
>
> A person who is subject to service of process and whose joinder will not
> deprive the court of subject-matter jurisdiction must be joined as a
> party if:
>
> (A) in that person's absence, the court cannot accord complete relief
> among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action
> and is so situated that disposing of the action in the person's absence
> may:
>
>> (i) as a practical matter impair or impede the person's
>> ability to protect the interest; or
>>
>> (ii) leave an existing party subject to a substantial risk of
>> incurring double, multiple, or otherwise inconsistent
>> obligations because of the interest.

FED. R. CIV. P. 19(a)(1).   The First Circuit explains that "Rule 19 addresses
situations where a lawsuit is proceeding without a party whose interests are central
to the suit. . . . The Rule calls for courts to make pragmatic, practical judgments
that are heavily influenced by the facts of each case." *Bacardí Int'l Ltd. v. V. Suárez
& Co., Inc.*, 719 F.3d 1, 9 (1st Cir. 2013).   "Questions under Rule 19(a) are fact-
bound and driven by the nature of the issues before the court." *Id.* at 9-10.

Regarding the first Rule 19(a) factor—whether the Court can "accord
complete relief among existing parties"—the Secretary notes that "Maine's presence
would not be necessary to effect the relief that the Complaint seeks," *Def.'s Mot.* at
24, and the Plaintiffs emphasize that the issue under Rule 19 is whether the Court
can afford relief "not in an overall sense, but between the extant parties," and

observe that all they are asking for is a declaration that the Secretary's approval of SPA # 12-010A was unlawful and injunctive relief directing her to withdraw her approval. *Pls.' Opp'n/Mot.* at 26. Rule 19(a)(1)(A) may therefore be satisfied, *see Bacardí*, 719 F.3d at 10-11, but the Plaintiffs' narrowly confined prayer for relief raises a different, more basic question that the parties have not addressed: whether the Plaintiffs have standing.  "[T]he irreducible constitutional minimum of standing" requires that it "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations omitted); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 n.5 (1998) (standing requires that a plaintiff "personally would benefit in a tangible way from the court's intervention") (internal quotations omitted).

Although the Plaintiffs are "confident that [Maine] DHHS will abide by this Court's ruling," there are at least plausible arguments that neither state nor federal law would require that Maine reinstate the Plaintiffs' benefits following a favorable ruling from this Court, and it would be surprising if the State did not press these arguments.  Maine's Governor and DHHS Commissioner argued to the Secretary that she was required to approve the plan amendments proposed in both SPA # 12-010 and SPA # 12-010A because enforcing the ACA's maintenance of effort requirement would be unconstitutional under *NFIB*.  The Secretary rejected this argument in declining to approve SPA # 12-010, AR Attach. 1 at 10-13, but no court has addressed the question.  There appears to be some weight to the argument that,

30

following *NFIB*, a state that chooses not to expand its Medicaid coverage under section 2001(a) of the ACA need not comply with the maintenance of effort requirement of section 2001(b).[14]   As an absentee, however, the state of Maine cannot make the argument.

If the Court were to direct the Secretary to vacate her approval, therefore, Maine would not be bound by this Court's judgment; Maine could maintain its plan as amended, and refuse to reinstate the Plaintiffs' benefits, meaning that no tangible benefit would result to the Plaintiffs from this Court's ruling.  *See Steel Co.*, 523 U.S. at 103 n.5.   State law conditioned the plan amendments on the Secretary's approval, 2011 Me. Laws ch. 657 § HH-3, but the State has already received her approval, arguably satisfying the state law's condition precedent; whether a subsequent court-ordered vacatur would undo the amendment does not have an obvious answer and is a question of state law.  If Maine did not voluntarily undo the amendments, the Secretary represents that her "only enforcement authority would be to bring a compliance action, which is committed to her discretion."  *Def.'s Mot.* at 24; *see* 42 U.S.C. § 1396c.   She notes that even if she chose to do so, "the compliance proceedings would be lengthy and only prospective relief in the form of a funding cut-off would be available."  *Def.'s Mot.* at 24.  In other

---

[14]   As of June 20, 2013, Maine had not expanded its Medicaid coverage under section 2001(a). *See* Matthew Stone and Robert Long, *Maine House deals final blow to Medicaid expansion*, BANGOR DAILY NEWS (June 20, 2013), http://bangordailynews.com/2013/06/19/politics/maine-house-fails-to-override-medicaid-expansion-veto/.

How, if at all, *NFIB* affects the enforceability of the MOE requirement is a difficult legal question that is not currently before the Court and has not been briefed.  The Court mentions it only because it would be reasonable to expect the State to continue to press the argument in defense of SPA # 12-010A were the Court to rule for the Plaintiffs.  It appears that Maine is currently contesting the Secretary's refusal to approve SPA # 12-010, likely on this ground.  *See* 78 Fed. Reg. 21608 (Apr. 11, 2013).

words, she has no authority to order Maine to provide benefits; she can only threaten to withhold federal funds. Cutting Maine off from federal funds would not directly benefit the Plaintiffs. In addition, Maine would likely defend against a compliance action by renewing its constitutional argument under *NFIB*, which only a court has the authority to decide.

Turning to Rule 19(a)(1)(B)(i), which "is concerned with protecting the interests of the absent party," *Bacardí*, 179 F.3d at 10, the Secretary contends that because she is defending her approval, "Maine's absence as a practical matter does not leave its interests concerning the SPA unprotected." *Def.'s Mot.* at 24. She maintains that a ruling here would not lead to inconsistent obligations. *Id.* The Plaintiffs note that the State is aware of this case but has not sought to intervene, and agree that the federal government will adequately protect the State's interests. *Pls.' Opp'n/Mot.* at 28-29. The parties ignore, however, that the State defended its proposed amendment on both statutory and constitutional grounds, while the Secretary defends her approval based only on a statutory argument; indeed, she rejected SPA # 12-010 because she disagrees with the State's constitutional argument. To this extent, therefore, her interests are not identical but actually contrary to the State's.

It is not clear why the Plaintiffs have not sought injunctive relief against a State officer directly. Given the unusual circumstances of this case—in particular, the unresolved background dispute between the State and the Secretary over the constitutionality of the ACA's maintenance of effort requirement—the Court

concludes, based on both Article III's case or controversy requirement and the Rule 19 factors, that the Plaintiffs cannot proceed against the Secretary alone.

## VI.   THE MOTION TO CERTIFY CLASS AND THE MOTION FOR PRELIMINARY INJUNCTION

This result will impact two other motions: the Motion for Preliminary Injunction (ECF No. 14) and the Motion for Class Certification (ECF No. 13). The Court will dismiss this suit unless the plaintiffs implead the state of Maine. If the plaintiffs choose not to do so, both of the other motions will be dismissed with the rest of the case. If the plaintiffs do implead the state of Maine, then the State will likely bring additional and different arguments with respect to the "maintenance of effort" requirement. In that case, both the Motion for Preliminary Injunction and the Motion for Class Certification will need to be revised to address the State's arguments. Consequently, the Court dismisses without prejudice both the Motion for Preliminary Injunction and the Motion for Class Certification.

## VII.   CONCLUSION

The Court ORDERS the Plaintiffs, if they choose, to file within fourteen days of the date of this Order a motion for leave to amend their Complaint to add a State Defendant. In the event the Plaintiffs fail to file such a motion, the Plaintiffs' Complaint will be dismissed without prejudice.

The Court DISMISSES WITHOUT PREJUDICE the Motion for Preliminary Injunction (ECF No. 14) and DISMISSES WITHOUT PREJUDICE the Motion for Class Certification (ECF No. 13).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 30th day of September, 2013